No. 76,846

DONALD F. JARBOE and LINDA P. JARBOE, Co-Guardians and Co-Conservators For JASON M. JARBOE, a disabled person, *Appellants/cross-appellees*, v. THE BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY, KANSAS, *Appellee/cross-appellant*, and WILLIAM C. VANN, *Defendant*, and JANET SCHALANSKY, ACTING SECRETARY OF SOCIAL AND REHABILITATION SERVICES, an Agency of the State of Kansas, and THE STATE OF KANSAS, *Appellees/cross-appellants*.

(938 P.2d 1293)

Opinion filed June 6, 1997.

*Loren H. Houk,* of Wichita, argued the cause and was on the briefs for appellants/cross-appellees.

*Michael George,* of Kansas Department of Social and Rehabilitation Services, of Topeka, argued the cause and was on the brief for appellees/cross-appellants Janet Schalansky and State of Kansas.

*Greer Gsell,* of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, argued the cause and was on the brief for appellee/cross-appellant Board of County Commissioners of Sedgwick County.

The opinion of the court was delivered by

LARSON, J.: This is a personal injury action brought by Donald and Linda Jarboe, co-guardians and co-conservators for their son, Jason M. Jarboe, who was shot and severely injured by Charles Edward Clare, an escapee from a youth residence facility where he had been placed by the Kansas Department of Social and Rehabilitation Services (SRS) following a juvenile court adjudication in Sedgwick County, Kansas. The defendants are the Board of County Commissioners of Sedgwick County, (Sedgwick County) as the operators of the juvenile residence facility, and SRS. The Jarboes alleged negligence in the placement and supervision of Clare.

The trial court determined the defendants were immune from liability under what is now K.S.A. 1996 Supp. 75-6104(d) and (e) of the Kansas Tort Claims Act (KTCA) and granted summary judgment in their favor. The Jarboes appealed. The defendants cross-appealed the trial court's failure to also find they were entitled to immunity under what is now K.S.A. 1996 Supp. 75-6104(b).

*Factual statement*

The trial court essentially accepted SRS's and Sedgwick County's statements of material fact that were not controverted by the Jarboes. It ruled the remaining facts were not material for a proper determination of the legal issues.

Charles Edward Clare was adjudicated a juvenile offender for unlawful deprivation of property (joy riding) on November 4, 1992. Clare had previously been subject to adjudications in juvenile court for misdemeanor criminal damage to property and misdemeanor theft in July 1990, and misdemeanor battery because of a fistfight in October 1990. Clare received probation for each of these prior offenses and successfully completed each probation period.

Clare had also been hospitalized for his aggressive and antisocial behavior, first, at Charter Hospital in Wichita (Charter) from January 24, 1988, to February 23, 1988, and again at Charter from October 29, 1990, to January 3, 1991. The later hospitalization followed the battery adjudication. The physicians at Charter recommended Clare's transfer to the Shadow Mountain Institute

(Shadow Mountain) in Tulsa, Oklahoma, for extended inpatient treatment, which is where Clare remained from January 4, 1991, to May 10, 1991.

The court services officer who prepared Clare's predisposition report for the unlawful deprivation of property offense recommended probation. However, the juvenile court ruled that Clare should be placed in the custody of SRS and recommended an out-of-home placement. No specific placement was suggested.

At that time, the making of placement decisions for juveniles in SRS custody was controlled by section 4521 of the SRS Kansas Manual of Youth Services (KMYS). That section, entitled "Levels of Care Facilities for Group Boarding Homes/Residential Centers," provided:

"The effectiveness of the referral process depends on the extent to which significant behavior characteristics of the youth can be identified. An effective service delivery system must provide a means for placing clients in agencies with programs relevant to their service needs.

A. All referrals of youth to level of care group boarding homes and residential centers will be based on the matching of the child's characteristics with the specific level of care provided by the facility.

B. Based upon the well-substantiated data regarding the child gathered from all available sources, the child's service worker, with the assistance of the administrative review/staffing team shall complete the Placement Behavior Scale [YS-3409].

C. The administrative review/staffing team will identify and assign the overall level of care for the child or youth.

D. Based upon the assigned overall level of care for the child or youth, the administrative/staffing team will identify from the Residential Services for Children and Youth Resource Directory the appropriate level group home or residential center to which the child or youth shall be referred."

The SRS case worker assigned to Clare's case was Shari New. In making the placement, New interviewed Clare; reviewed documents from the juvenile court, educational records, psychological evaluations, and medical discharge summaries; considered the results of an interview by an intern with Clare's mother; and examined form 815, the Comprehensive Information Sheet—Juvenile Offender, which had replaced form YS-3409 (a requirement of section 4521 of the KMYS).

New was aware of Clare's hospitalization history, but did not seek or obtain Clare's medical records from Shadow Mountain before making a placement recommendation. New also did not receive Clare's entire medical record from Charter, although she read psychological evaluations and medical discharge summaries from at least two doctors at the hospital. She admitted in a deposition that she had not obtained data from "all available sources," but maintained in an affidavit that nothing in the Shadow Mountain records would have changed her placement decision.

New referred Clare to two licensed residential facilities, Judge Riddel Boys Ranch (JRBR), a level V residential facility, and Elm Acres Home, a level IV residential facility. Level IV facilities are less restrictive than level V facilities, as residents may attend public schools rather than receive in-house schooling. A level V facility is defined in the KMYS as a "non-secure facility providing 24-hour residential care for children and youth with severe maladaptive or disruptive behavior who require a program which provides consistent structure, frequent therapeutic intervention, a controlled environment with a high degree of supervision."

In making the referral of Clare to these facilities, New deemed Clare to be a nonviolent offender despite his misdemeanor battery charge. Clare was accepted at both facilities, but was placed in JRBR because Elm Acres Home was full.

Sedgwick County owns and operates JRBR, a treatment facility for male juvenile offenders. Admissions criteria for JRBR are consistent with level V care standards established by the State of Kansas. Those eligible for admission must meet the following criteria, according to JRBR Policy 17.1, III.B.:

"1. Male, court adjudicated juvenile offenders who have been Court ordered through a Kansas Juvenile Court into State custody for out-of-home placement.

"2. Be between the ages of 13 and 18 and a resident of one of the following counties: Sedgwick, Sumner, Reno, Cowley, Kingman, Butler, Harvey.

"3. Be referred by an SRS social worker from one of the Area Offices serving one of the counties identified above in item 2.

"4. The juvenile has been adjudicated for offenses deemed to be nonviolent and has no history of violence against others that involves the use of weapons.

"5. The juvenile shows indications of being amenable to counseling and expresses willingness to working the program by cooperating with rules, participating

in counseling, working in school and taking part in program services to the best of their ability.

"6. The juvenile is not an obvious runaway risk."

Mark Masterson, the Assistant Director of the Department of Youth Services in Sedgwick County, made admissions decisions for JRBR and authored the admissions policy. Masterson reviewed information in the referral package sent by SRS regarding Clare's criminal history, hospitalizations, education, and health; performed a computer background check; and interviewed Clare, his mother, and New. In deciding to accept Clare, Masterson considered Clare an average level V referral and did not deem him to be a violent offender by reason of his misdemeanor battery charge. Although Masterson was aware that Clare had received an early discharge from Shadow Mountain, he did not obtain the hospital's records. Masterson stated in an affidavit that nothing in the Shadow Mountain records would have altered his decision to admit Clare to JRBR.

The record does not support the Jarboes' contention that examination by New and Masterson of the Shadow Mountain records would have provided information making Clare ineligible for placement and admission to JRBR. The Jarboes' expert stated there were red flags in the information already available that should have warned the defendants, not that the missing records contained further critical information. The Jarboes also claim the Shadow Mountain records would have revealed that Clare required the use of isolation rooms, but their expert indicated this information was included in the materials New reviewed prior to making her placement decision.

The Jarboes further contend the complete Charter records would have revealed Clare may have tried to give a piece of metal to a girl to cut her wrists, although such information may not even have been discovered or appreciated by a nonexpert reading the voluminous records. Just prior to mentioning this incident, the Jarboes' expert indicated, "There were various and sundry comments in the Charter records. We have to go through those piece by piece."

When SRS placed Clare at JRBR on February 3, 1993, he had no prior history of leaving any hospital, SRS institution, youth residential facility, or community mental health center without authorization. JRBR is not a prison. It is not enclosed by fences. Its doors remain unlocked. It has no armed guards. Pursuant to JRBR Policy 8.2 and 9.3, staff members are prohibited from using active force or physical restraints to prevent residents from leaving the premises and are prohibited from chasing residents who depart. When a resident is determined to be absent without leave, JRBR policy requires the shift supervisor to file a runaway report with the sheriff by calling 911 as soon as possible.

After stuffing their beds to make them appear occupied and tearing a window screen, Clare and a roommate climbed out the window and walked away from JRBR on February 18, 1993, some time between 11 p.m. and midnight. The parties dispute the actual time of departure, but the records clearly indicate Clare's absence was discovered by at least midnight and immediately reported to the Sedgwick County Sheriff.

A JRBR logbook indicates Clare mentioned leaving the facility on February 15, 1993. JRBR policy requires room checks to be made every 15 minutes between 11 p.m. and 1 a.m. In a deposition, Clare testified that room checks were not done more than once an hour and that he left after the 11 p.m. check. Clare also alleged that he would have returned to JRBR if he had been detected trying to leave.

After leaving JRBR, Clare stayed at a friend's house until about 5 a.m. He then stole a vehicle left running at a Goddard convenience store, drove to Wichita, and picked up a friend, who brought a loaded gun. At about 1:20 p.m. on February 19, 1993, while driving around, Clare fired at a pickup truck and shot Jason Jarboe. Jarboe suffered serious head injuries and is permanently disabled. Clare pled nolo contendere to several counts of unlawful discharge of a firearm at an occupied vehicle and unlawful deprivation of property and was incarcerated.

Although the Jarboes claim their disputed evidence raises issues of material fact precluding summary judgment, all this evidence relates to the standard of care by New, Masterson, and the JRBR

staff and is relevant only to the proving of negligence. It does not bear upon the issue of whether SRS and Sedgwick County are entitled to immunity pursuant to the KTCA, nor does it preclude us from considering the grant of summary judgment.

The Jarboes' suit asserted negligence on the part of SRS for placing Clare at JRBR and on the part of JRBR for accepting Clare and failing to keep him confined. The Jarboes also sued the driver of the truck Clare stole. The driver obtained an order of summary judgment, which the Jarboes did not appeal.

SRS and Sedgwick County moved for summary judgment, alleging immunity pursuant to 75-6104(d) and (e). Following the Jarboes' response to their motions, SRS and Sedgwick County amended their motion to also assert immunity under 75-6104(b).

The trial court ruled that both SRS and Sedgwick County were immune from liability under 75-6104(d) and (e) and granted summary judgment. The Jarboes appeal. SRS and Sedgwick County cross-appeal the trial court's failure to find that they were also immune from suit pursuant to 75-6104(b). The case was transferred to us pursuant to K.S.A. 20-3018(c). We affirm the trial court and consequently do not consider the cross-appeal.

*Standard of Review*

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." K.S.A. 60-256(c).

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case." *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260, 891 P.2d 435 (1995).

We are obligated on appeal to resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom summary judgment was entered. Summary judgment should be denied where reasonable minds could differ as to the conclu-

sions to be drawn from the evidence. *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1044, 934 P.2d 121 (1997). However, simply because the Jarboes have asserted something as true, without factual support in the record, we are not required to accept the evidentiary basis for their claims. In *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 830, 877 P.2d 430 (1994), we said:

"It is incumbent on the party opposing a motion for summary judgment to counter alleged uncontroverted facts with something of evidentiary value. *Glenn v. Fleming*, 247 Kan. 296, 305, 799 P.2d 79 (1990). Courts have discretion to treat a fact as uncontroverted when the party controverting the alleged uncontroverted fact fails to cite any factual authority for support. *Danes v. St. David's Episcopal Church*, 242 Kan. 822, 830, 752 P.2d 653 (1988)."

The trial court's conclusion that SRS and Sedgwick County are immune from liability under exceptions to the KTCA is a matter of law. See *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 451, 912 P.2d 729 (1996). We have unlimited review of questions of law. *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 716, 924 P.2d 1239 (1996).

*Arguments and authorities not primarily considered*

We first point out that we do not base our decision on the contentions of SRS and Sedgwick County, raised for the first time on appeal, that they owed no duty to Jarboe. Ordinarily, issues not raised to the trial court cannot be raised on appeal. *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 828, 888 P.2d 832 (1995); see also *Bolyard*, 259 Kan. 447, Syl. ¶ 8 ("A new legal theory may not be asserted for the first time on appeal or raised in a reply brief.").

However, we do have authority for considering such an issue if it falls under the exceptions restated in *State v. Bell*, 258 Kan. 123, 126, 899 P.2d 1000 (1995), relying on *Pierce v. Board of County Comm'rs*, 200 Kan. 74, Syl. ¶¶ 3, 4, 434 P.2d 858 (1967), where we recognized the following exceptions to the general rule:

" '(1) Cases where the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case;

" '(2) Questions raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial of fundamental rights; and

" '(3) That a judgment of a trial court may be upheld on appeal even though that court may have relied on the wrong ground or assigned a wrong reason for its decision.' [Citation omitted.]."

In a recent similar case we will later rely on, *Burney v. Kansas Dept. of SRS.*, 23 Kan. App. 2d 394, 397, 931 P.2d 26 (1997), the Court of Appeals addressed the legal duty argument even though it had not been raised in the trial court. Thus, whether a legal duty exists could similarly be a logical manner of resolving this case and upholding the trial court's decision, even though we do not reach this question.

We keep in mind that a decision to grant summary judgment on the basis of immunity does not mean we acknowledge any duty existed on the part of the defendants to protect Jarboe from Clare's criminal actions. Our recent decision in *Gragg*, 261 Kan. 1037, clearly raises a real question as to the defendants' ability to control or foresee the criminal conduct of a third party so that liability could be imposed. See *P.W.*, 255 Kan. 827.

Additionally, a discussion of duty would invite comparison to *C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4 (1993) (holding SRS cannot avoid liability under the KTCA for placing a juvenile in a facility with another juvenile who SRS should have known had violent and sexually devient propensities), and *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993) (holding that KSU cannot avoid liability under the KTCA for placing a student in the same dorm as a man accused of committing rape). These cases are clearly distinguishable, however, on the basis that in both instances, the victim, as well as the perpetrator, was under the care, custody, or control of the entity alleged to be negligent.

We decline to resolve this appeal on the question of whether a duty was owed, as such was not the centerpiece of the trial court's grant of summary judgment, and we choose to resolve the case in the same manner as it did. See *Sharp v. State*, 245 Kan. 749, 753, 783 P.2d 343 (1989), *cert. denied* 498 U.S. 822 (1990). Nor will we discuss the question recently considered in *Gragg*, 261 Kan. 1037, of foreseeability, which was not argued to us. Additionally, the involvement of the owner of the stolen vehicle, who may have been

624

an intervening party in the tragic set of circumstances, is not a factor we may consider in this appeal.

*Arguments and authorities in issue*

We are taught by a long line of cases that governmental immunity is the exception to the general rule:

"The Kansas Tort Claims Act makes liability the rule and immunity the exception, and the burden is on the State to establish its entitlement to any of the exceptions set forth in K.S.A. 1992 Supp. 75-6104. *Hopkins v. State*, 237 Kan. 601, 609, 702 P.2d 311 (1985). If the State cannot meet this burden, then the general rule of liability set forth in K.S.A. 75-6103 governs. *Allen v. Kansas Dept. of S.R.S.*, 240 Kan. 620, 622, 731 P.2d 314 (1987); *Jackson v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984)." *C.J.W.*, 253 Kan. at 13.

Although there is no question that SRS and Sedgwick County are governmental entities, they are still required to demonstrate entitlement to one or more of the statutory exceptions from liability.

K.S.A. 75-6103 sets forth the general rule of liability:

"(a) Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

The exceptions applicable to this case which would exclude liability are found in K.S.A. 1996 Supp. 75-6104:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

"(b) judicial function;

. . . .

"(d) adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence;

"(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."

The trial court specifically found that both defendants were entitled to immunity pursuant to 75-6104(d) and (e), but made no finding regarding 75-6104(b).

The Jarboes claim SRS can be held liable for their injuries by placing Clare at JRBR for two reasons: (1) New's failure to strictly comply with all the requirements of § 4521.B of the KMYS by failing to acquire information from "all available sources" (the Shadow Mountain medical records, as well as all records from Charter) and (2) the professional malpractice of New.

The Jarboes allege Sedgwick County may be found liable because (1) Masterson failed to follow mandatory policies by deeming Clare to be nonviolent despite a history of breaking windows and engaging in fistfights; and (2) JRBR allowed Clare to escape and failed to modify or manage his dangerous propensities, as the staff failed to comply with a JRBR policy requiring room checks every 15 minutes.

The cases relied upon by the Jarboes, *P.W.*, 255 Kan. 827; *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986); and *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984), do not provide any basis to reverse the trial court's decision.

*P.W.* was a negligence suit against SRS and the Kansas Department of Health and Environment (KDHE) for failure to revoke or suspend the license of a day care provider or take other corrective action when allegations of child abuse had been made. P.W. was resolved, as we could properly resolve the Jarboes' appeal, by our holding that there was neither a special relationship which would give rise to a duty owed by either SRS or KDHE to the plaintiffs under the Restatement (Second) of Torts §§ 314A, 315, 316-19, 320, or 324A (1984), nor a duty under the doctrine of parens patriae or under K.S.A. 38-1524. With no duty being owed by SRS or KDHE to P.W., we ordered that the motions for summary judgment of SRS and KDHE be granted.

Such a result would also be proper in this case, as there is a complete absence of any special relationship here which would create a duty to protect a specific individual rather than the public at large from possible criminal attacks. See *Gragg*, 261 Kan. at 1045.

The Jarboes assert a duty was owed as in *Fudge*, 239 Kan. 369, because SRS and Sedgwick County employees failed to follow mandatory policies. The Jarboes ignore in their analysis all of the provisions of subsection (d) of the KTCA which were previously set forth. This provision has not been widely interpreted since it was enacted in 1987, but its legislative history and subsequent mention in several cases clearly show that *Fudge* is no longer a decision that can be relied upon.

In *Fudge*, we held: "Where police officers are subject to a specific, mandatory set of guidelines to use with regard to handling intoxicated persons, the officers and the employing municipality are subject to liability under the Kansas Tort Claims Act for the failure to follow those guidelines." 239 Kan. 369, Syl. ¶ 3. This decision allowed recovery for a wrongful death resulting from police officers' failure to take a drunken driver into custody when they had the opportunity of doing so. The duty was predicated on a violation of Restatement (Second) of Torts § 324A(a), and a substantial judgment against the City of Kansas City was upheld.

This June 13, 1986, result in the *Fudge* decision was the subject of significant legislative hearings in the fall of 1986 and in 1987. The Kansas Legislature passed H.B. 2023 (L. 1987, ch. 353, § 3), which added a new subsection (d) to K.S.A. 75-6104, which stated:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable by damages resulting from

. . . .

"(d) *adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence.*"

The existing subsection (d) became (e), with the following italicized wording added:

"(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion *is* abused *and regardless of the level of discretion involved.*"

The legislative history of K.S.A. 75-6104(d) makes it clear that the 1987 amendment was intended to overrule the *Fudge* decision. The original proposal to amend the KTCA, so that internal government policies could not be used as the basis for finding the existence of a special duty allowing any violation of policy to result in liability, came from the League of Kansas Municipalities. See memorandum from Jim Kaup, League of Kansas Municipalities, to Chairman Joe Knopp and Members of the Special Committee on Tort Reform and Insurance Liability, September 11, 1986. The 1986 Special Committee on Tort Reform and Insurance Liability included the suggested *Fudge* amendment in its proposed H.B. 2023.

The Special Committee's proposed amendment was essentially the same as that adopted by the 1987 legislature except for the provision regarding the finder of fact. With respect to the *Fudge* amendment, the Report on Kansas Legislative Interim Studies to the 1987 Legislature 592 (1986) stated that H.B. 2023 "provides that liability cannot be established as a result of public employee's failing to follow written personnel policies *unless an independent duty of care is owed to the injured party.*"

At the 1987 session, the House Judiciary Committee deleted the *Fudge* amendment from H.B. 2023. The House passed the bill in that form, which then went to the Senate Committee on Judiciary. There, Chairman Winter made a motion to "reinsert the *Fudge* language and add separate sentence to make it clear that finder [of] fact may consider violation or lack of any personnel problem in determining question of negligence." Minutes of the Senate Committee on Judiciary (March 25, 1987). In addition, the Minutes of the Senate Committee on Judiciary reflect that "Senator Steineger explained the purpose of the motion *to re-establish the law as it existed prior to the Fudge existence.*" After H.B. 2023 went to conference committee, the *Fudge* amendment remained in its Senate form and subsequently became law.

In *Mills v. City of Overland Park*, 251 Kan. 434, 448, 837 P.2d 370 (1992), we said:

"The City of Overland Park and the officer defendants urge us to follow the reasoning of *amicus curiae* and hold that *Fudge* has been either overruled or

modified by the 1987 amendment to K.S.A. 75-6104. L. 1987, ch. 353, § 3. This is the first post-*Fudge* 75-6104(d) case to reach this court. The effect of 75-6104(d) on *Fudge* was not argued to the trial court. By virtue of having concluded that plaintiffs have no cause of action in tort against the governmental defendants, we need not determine the issues relative to the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*)."

In addition, the Court of Appeals noted in *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 497, 921 P.2d 216 (1996): "The amendment [75-6104(d)] was clearly intended to negate at least part of the holding of *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986)."

Most recently in *Burney*, 23 Kan. App. 2d at 402, it was held that SRS is immune under K.S.A. 75-6104(d) and (e) of the KTCA for liability premised on its failure to follow or enforce some of its own policies or regulations as set out in the KMYS. Although we will also utilize the *Burney* result and holding for further justification of the decision we reach herein, in reference to the effect of 75-6104(d) on *Fudge*, the *Burney* opinion stated:

"The Kansas Supreme Court in *Fudge v. City of Kansas City*, 239 Kan. at 375, permitted the plaintiff to predicate liability on the city because the police department failed to follow a mandatory provision of its own handbook. *Fudge*, however, was apparently not a popular decision with the Kansas Legislature.

"After the decision in *Fudge*, the Kansas Legislature amended 75-6104(d), which now reads as set forth above. As we said in *Beebe*: 'The amendment was clearly intended to negate at least part of the holding of [*Fudge*].' 22 Kan. App. 2d at 497. K.S.A. 75-6104(d) as it now reads provides immunity to SRS from liability premised on the failure of its investigators to comply with the statutory provisions or the KMYS in question. SRS in this case is immune from liability for that failure. Pursuant to the same reasoning, SRS is immune from liability for its failure to provide to the Kansas City Police Department all of its files relating to J.S., under K.S.A. 75-6104(c) and (d)." 23 Kan. App. 2d at 402.

The primary rationale for the enactment by the 1987 Kansas Legislature of subsection (d) to 75-6104 appears to be that *Fudge*, if continued as valid precedent, would encourage all governmental agencies not to develop any written policies, guidelines, or procedures, as any deficiency or failure to completely abide by these procedures would remove the agency's discretion and result in liability. This, in fact, is the basis the Jarboes rely on for imposing

liability in this case. However, the legislative history behind the 1987 amendments clearly demonstrates why their attempt to make governmental agencies liable for this tragic set of circumstances must fail.

Finally, *Jackson*, 235 Kan. 278, has no applicability to our case as it was decided before the 1987 amendments and involved a collision between two fire trucks. In *Jackson*, we held the operation of a vehicle was not a "discretionary function or duty" under then subsection (d) (now [e]) of 75-6104. 235 Kan. at 288-89.

We have previously cited *Burney*, 23 Kan. App. 2d 394, with reference to its discussion of the 1987 amendments on the *Fudge* decision, but it is instructional to look at this recent decision in greater detail. School teacher Burney was the subject of an alleged child abuse investigation by SRS pursuant to K.S.A. 38-1524. The investigative results were made known to law enforcement authorities. Burney was charged with aggravated sexual battery and bound over at a preliminary hearing, but the case was apparently dismissed because of undisclosed information in a file concerning a complaining witness.

Burney sued SRS, contending negligence and malicious prosecution. A jury verdict on his behalf was reversed on appeal in a well-reasoned opinion which reached the question of whether SRS owed a duty to Burney. The Court of Appeals found SRS did not owe a duty under any of the Restatement (Second) of Torts sections cited, under K.S.A. 38-1524, or under certain provisions of K.S.A. 38-1523 as applied to section 1220 of the KMYS. In finding that no duty was created, *Burney* declared:

"The mandatory terms used in 38-1523 and KMYS §§ 1220 and 2210 must be read in context. These directives are used in connection with the performance by SRS of its *public duty* to investigate allegations of child abuse. The existence of those mandatory terms relied upon by defendant do not create or even imply that the duties outlined are owed to a child abuser or any other party." 23 Kan. App. 2d at 401.

The *Burney* court also concluded SRS was immune from liability under the KTCA. The opinion recognized that "in two or more instances SRS may have failed to follow its own rules by failing to provide information in its possession to the Kansas City Police De-

partment. At one. time, Burney could have built a valid action against SRS on this basis. He no longer may do so." 23 Kan. App. 2d at 402. *Burney* continued with the statements previously set forth concerning the negation of *Fudge* by the amendments to the KTCA, then opined:

"K.S.A. 75-6104(d) as it now reads provides immunity to SRS from liability premised on the failure of its investigators to comply with the statutory provisions or the KMYS in question. SRS in this case is immune from liability for that failure. Pursuant to the same reasoning, SRS is immune from liability for its failure to provide to the Kansas City Police Department all of its files relating to J.S., under K.S.A. 75-6104(c) and (d)." 23 Kan. App. 2d at 402.

Additionally, as to the claim of liability based on the failure of SRS to conduct a proper investigation, *Beebe*, 22 Kan. App. 2d at 496, was cited for the rule that the decision to open a file for future investigations is a discretionary function, as is the decision to conduct a child abuse investigation, for which immunity from liability is granted by the provisions of K.S.A. 75-6104(e). *Burney*, 23 Kan. App. 2d at 403.

Regarding the Jarboes' claims against SRS, first, it is clear that any duty, as in *Burney*, contained in the terms of § 4521B of the KMYS is a public duty. Any mandatory terms of the provision in no way created a duty owed to specific individuals, such as the Jarboes. Second, it appears questionable whether there even was a violation of the KMYS in this case. We reached such a result in *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 912 P.2d 729 (1996), where we found that no SRS mandatory provisions had been violated and that SRS's actions fell within the discretionary function exception to the KTCA.

The Jarboes ask for an entirely too restrictive reading of the KMYS guidelines. The gathering of every last bit of information in every situation calling for a prompt and efficient decision would delay and circumvent the decision-making process. In *G. v. State Dept. of SRS*, 251 Kan. 179, 833 P.2d 979 (1992), we rejected an argument that would have required a restrictive reading of SRS guidelines. We declared: "We cannot endorse such a restrictive concept. SRS carries a responsibility to act in the best interests of children in its custody regardless of whether the harm is specifically

defined in its guidelines." 251 Kan. at 191. This is surely an indication that policies and procedures should not be read so strictly that the agency's inherent functions are impaired, as would be the case here if we adopted the Jarboes' interpretation of the KMYS provision.

The foregoing discussion was not intended to focus on the exception in subsection (d) of 75-6104 to the exclusion of subsection (e). Even if we found that the KMYS was violated, we would still find immunity under subsection (e). Clearly, the exercise of a placement decision falls under a discretionary function "whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. 1996 Supp. 75-6104(e).

In addition, even assuming the provisions of the KMYS were violated, the Jarboes have made no showing that compliance with the provisions by obtaining the Shadow Mountain records and all the Charter records would have resulted in a different placement decision. Thus, even if the Jarboes could prove the breach of some duty by the failure to follow the KMYS, they have set forth no facts establishing a nexus between this failure and their injuries.

As an alternative ground for liability, the Jarboes claim that New's professional negligence prevents SRS from claiming immunity under the KTCA. This ground is without merit. Essentially, the argument is that if it is established that New was negligent in her placement of Clare, the exceptions to immunity under the KTCA do not apply because a government agency does not have a discretionary right to violate a legal duty and avoid liability, citing *Lindenman v. Umscheid,* 255 Kan. 610, 875 P.2d 964 (1994). We rejected such a contention in *Gragg,* 261 Kan. at 1059, and said that a legal duty to the public at large is not equivalent to a legal duty to a specific individual. Under the Jarboes' reasoning, there could never be an exception to the KTCA if negligence exists. This is not the case. Even if we said both New and Masterson were negligent (which we specifically do not say), both SRS and Sedgwick County would still be immune from liability under the exceptions to the KTCA.

It is clear that placement decisions such as the one here involve the exact type of discretion that the KTCA was enacted to protect.

In *G. v State Dept. of SRS,* 251 Kan. at 191, we stated in regard to the placement of a child put in foster care: "The actions of SRS were of the discretionary nature that the legislature intended to put beyond judicial review." We went on to discuss *Beck v. Kansas Adult Authority,* 241 Kan. 13, 735 P.2d 222 (1987), regarding a challenge to a parole board action.

*Beck* is particularly helpful in that the plaintiffs there made claims against the Kansas Adult Authority similar to those the Jarboes now make against SRS. The *Beck* plaintiffs alleged that the Authority released a prisoner from custody without imposing conditions " 'when they knew or should have known of his foreseeable propensity for violence'; his mental condition; his lack of treatment while in the penitentiary; and his danger to himself, the general public, and the Medical Center and its occupants in particular." 241 Kan. at 33. Yet, we still held that the decision to release the prisoner without conditions was discretionary. We declared:

"The failure of a parole authority to carefully review all of the available records, the failure to send for other records which could have been secured, and the failure to take action which a thorough post-release review of the records would indicate were warranted, if true, may be negligence, but it is simply an exercise or failure to exercise a discretionary function or duty. It is the kind of activity of a state agency which is specifically exempted from the provisions of the Kansas Tort Claims Act.

"We do not believe that the legislature, in enacting the Kansas Tort Claims Act, intended to subject parole or probation decisions of the authorities, whether the Kansas Adult Authority or the sentencing judge, to litigation in order to determine whether the Authority or judge turned every tap and jumped through every hoop in arriving at a decision to place an inmate on parole or to impose conditions on a conditional release. It is these discretionary functions of state agencies or employees which the legislature intended to place beyond the pale of tort litigation.

"The possibility of harm to third persons exists every time a prisoner convicted of violent crime is released from custody and placed back into society, yet the time always arrives when release must be effected. A decision as to the imposition of conditions, if any, must be made. Such a decision involves the exercise of great discretion. Boan *had* to be released, under state law. Whether conditions *might* have been imposed which would have prevented this catastrophe is an open question. Hindsight, always better than foresight, indicates some conditions *might* have had some effect. But such a decision, made now, would merely second-guess the parole authority, the agency in whose hands the legislature entrusted the discretion." 241 Kan. at 36-37.

While our discussion has been directed to the claims against SRS, everything previously stated has equal application to the claims against Sedgwick County. However, we will briefly comment on the alleged improper actions of Sedgwick County.

The Jarboes contend two ways in which JRBR failed to follow its procedures and thereby breached a duty owed to them: first, that Masterson "deemed" Clare to be nonviolent despite his history of breaking windows and engaging in fistfights, second, that the JRBR staff failed to perform proper room checks. There is no merit to either contention.

As to the first of these claims, it is clear that Masterson had discretion to admit juveniles into JRBR. Policy 17.1, written by Masterson, provides: "The juvenile has been adjudicated for offenses deemed to be nonviolent and has no history of violent behavior against others that involves the use of weapons." The use of the word "deemed" is a clear indication that discretion is involved. It is clear the policy is not interpreted in the manner suggested by the Jarboes. An agency's interpretation of its own regulations should be granted deference and not disturbed on appeal unless clearly erroneous or inconsistent with the regulation. *Murphy v. Nelson,* 260 Kan. 589, 595, 921 P.2d 1225 (1996).

Nor should Clare's past behavior be deemed violent under the plain language of this requirement for admission to JRBR. Damage to property is not normally considered a violent offense, and the policy clearly differentiates between aggressive behavior with and without the use of weapons. In addition, Masterson had no knowledge of the incident where Clare allegedly attempted to give a girl a piece of metal with which to cut her wrists, and the Jarboes have pointed to no regulation or policy mandating that *he* was required to obtain this information. From this, we conclude that the decision to admit Clare to JRBR is clearly discretionary and falls within the discretionary function exception of 75-6104(e) of the KTCA.

Finally, the Jarboes have completely failed to prove a sufficient nexus between JRBR's failure to perform room checks and the shooting of Jason Jarboe. All the Jarboes have shown are facts supporting an inference that room checks were not performed every 15 minutes and that Clare would not have continued an escape

attempt had he been caught. However, as it is uncontested that Clare left immediately following a room check, these facts fail to establish that if room checks had been performed every 15 minutes, Clare would have not walked away from JRBR.

Based on the record presented, it appears Clare was in a non-secure facility without fences, locked doors, or armed guards and with staff members prohibited from using active force or physical violence to prevent residents from leaving or from chasing those who did depart. K.S.A. 1996 Supp. 75-6104(d) clearly applies to the actions of Sedgwick County in this situation, as the county owed no independent duty to the Jarboes to prevent Clare from leaving the facility. Thus, even if JRBR's policy regarding room checks was not followed, Sedgwick County still is immune from liability under 75-6104(d).

In the final analysis, it is clear to us that fact situations like the one in this case are exactly the type where the Kansas Legislature desired to grant immunity to governmental units. The legislative history makes this clear, and the addition of the present subsection (d) and the new wording of subsection (e) to 75-6104 protects the actions of SRS and Sedgwick County in this case. There are other reasons why summary judgment would have been proper in this case, but we specifically hold that immunity under 75-6104(d) and (e) exists.

We have considered all of the Jarboes' arguments, whether specifically answered herein, and find them to be without merit.

Affirmed.