No. 78,269

TERRY FETTKE, *Appellant/Cross-Appellee*, v. CITY OF WICHITA, *Appellee/Cross-Appellant*.

(957 P.2d 409)

Opinion filed April 17, 1998.

*Mark T. Schoenhofer,* of Wichita, argued the cause and was on the briefs for the appellant/cross-appellee.

*Blaise Plummer,* assistant city attorney, argued the cause and *Gary E. Rebenstorf,* city attorney, was with him on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

SIX, J.: This is a case under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.* The plaintiff, Terry Fettke, a police officer, sued his employer, the City of Wichita (the city) for damages. The claim is based on a violation of police department policy, *i.e.*, releasing the officer's name to the news media after a fatal shooting. The district court, in granting summary judgment for the city, found no independent duty owing to the officer and thus the city was immune under the K.S.A. 75-6104(d). The officer appeals. The city cross-appeals the district court's finding that Fettke's petition was not barred under the police department Policies and Regulations Manual. Our jurisdiction is under K.S.A. 20-3018(c) (a transfer on our motion).

The issue is whether the district court erred in holding that the city was immune from liability under K.S.A. 75-6104(d). Was the district court correct in reasoning that the city owed no duty of

care to Fettke not to release his name to the media in connection with the fatal shooting incident, independent of the Policies and Regulations Manual? The answer is, yes. We affirm summary judgment for the city. Because our affirmance disposes of Fettke's claim, we do not reach the city's cross-appeal.

## FACTS

The Wichita Police Department has an internal policy on media relations. Section 706.05 of the 1995 Policies and Regulations Manual reads:

"INFORMATION SHALL NOT BE RELEASED PERTAINING TO: (1) Names of officers involved in critical incidents [such as shootings]."

While on duty, Fettke and fellow officer Mark Barnes were in a gun battle. Barnes was wounded. Fettke returned fire, wounding Franchot "Corky" Mitchell. Mitchell was taken to a hospital for treatment, where he died. Fettke is white, Mitchell was black. Fettke's name was released to the news media by either the chief or deputy chief of police. A newspaper reported Fettke's involvement. Radio and television broadcasts also contained Fettke's name. Fettke and his immediate family members received threats of revenge. Fettke alleges that because of the release of his name and resulting threats, he suffered emotional distress and stress-related physical injuries.

Although Fettke's conduct was investigated and later cleared, newspaper accounts raised questions about whether Fettke had fired shots at Mitchell after Mitchell was already down.

Fettke has experienced chest pains, nightmares, loss of sleep, stomach problems, and marital problems because of the aftermath of the shooting incident. He first became aware of the release to the media when he saw his name in the newspaper while at the hospital visiting Barnes. He knew publication of Barnes' name would cause problems for Barnes in the hospital and for himself on the streets. Fettke described several instances that happened to him after he returned to work. Individuals would see Fettke's name tag at a car stop and say things like, "[Y]ou're the one who killed Corky in cold blood and your time's coming."

Shortly after the shooting incident, Fettke's wife, who worked at the hospital where Mitchell had died, heard of threats against her life by people employed in the hospital housekeeping department. Several staff members at the hospital were from the community where the shooting incident took place. Fettke's children received taunts at school about their father being a murderer.

Pamphlets had been circulated calling for retaliation against Fettke. Fettke was told of T-shirts with Corky Mitchell's picture on the front and words similar to "give Fettke justice" or "Corky gone but not forgotten" on the back. Fettke learned of a local radio broadcast in which various people expressed strong feelings that justice was not being done to Fettke.

Every police recruit's training includes reading every provision in the policy manual. They are tested on it. Fettke was taught that Section 706.05 meant exactly what it said, with no exceptions.

The police chief admitted briefing the press at the hospital on the night of the shooting but denied having released Fettke's name to the media at any time. Fettke believes that the chief first released his name to the media on the night of the shooting. The chief interpreted Section 706.05 to mean that "the ranking officer at the scene of an incident will not release the name of an officer involved in a critical incident." The only time an officer's name should not be released concerning a shooting would be at the scene. The chief did not view the policy as prohibiting release from a location other than the scene. He acknowledged that a normal consequence of identifying an officer involved in a shooting would be threats to the officer or members of his family. However, he also believed that threats on a police officer's life are "just part of that police officer's duty."

The deputy police chief admitted verifying Barnes' and Fettke's names to the press as being involved in the shooting, on the morning following the shooting. At the time of the verification, the deputy was told by another officer that the chief had released the names to the press at the hospital. The deputy chief believed that the chief had the ultimate authority to contravene a particular policy in a particular incident. However, no written provision in the policy manual could be identified. The deputy chief also acknowl-

edged that release of Fettke's name to the press may have placed Fettke at risk. He viewed the risk as "part of the job."

Mike Watson, the current police chief, said that in his view, the chief can do something contrary to policy if it is something that is in the best interests of the police department or city. He could not recall any shooting incident when the name of the officer was released to the media. The current chief acknowledged that Fettke's safety should have been a factor considered before the release of his name.

Fettke, relying on negligence and the Civil Rights Act, 42 U.S.C. § 1983 *et seq.* (1994), claimed personal injury and violation of his civil rights.

The city filed for summary judgment, arguing: (1) the city owed no duty of silence to Fettke, who was a police officer and a public official with no right of privacy; (2) no proximate cause is shown between the city's release of Fettke's identity to the media and Fettke's alleged damages; (3) the city is immune from liability under K.S.A. 75-6104 (c) (law enforcement), (d) (written personnel policy), (e) (discretionary function), (i) (assumption of risk), and (n) (police protection); and (4) Fettke's 42 U.S.C. § 1983 claim fails because alleged negligent conduct is not a sufficient basis for such a claim.

The district court granted summary judgment, reasoning the city was immune from liability under K.S.A. 75-6104(d). Fettke's 42 U.S.C. § 1983 claim was denied. Fettke has not briefed and has thus abandoned his 42 U.S.C. § 1983 civil rights claim. See *Pope v. Ransdell,* 251 Kan. 112, 119, 833 P.2d 965 (1992).

## DISCUSSION

We are reviewing a summary judgment ruling. As Fettke points out, summary judgments are to be granted with caution in negligence actions. See *Honeycutt v. City of Wichita,* 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 (1992). We are required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of Fettke. *Kerns v. G.A.C., Inc.,* 255 Kan. 264, 268, 875 P.2d 949 (1994). It is apparent that conclusions of law are involved. Our standard of review is unlimited. See *Jarboe v. Board of Sedgwick*

*County Comm'rs,* 262 Kan. 615, 622, 938 P.2d 1293 (1997). For a discussion of the familiar rules on summary judgment, see *Jarboe,* 262 Kan. at 621.

In resolving this appeal, we consider the impact of the KTCA on Fettke's claim. The common-law rule is that a state as the sovereign is immune from suit unless it consents. *Woodruff v. City of Ottawa,* 263 Kan. 557, 951 P.2d 953 (1997), (involving application of K.S.A. 75-6104[e], the "discretionary function" exception). The KTCA provides the consent, subject to certain exceptions. Liability is the rule and immunity the exception. K.S.A. 75-6103 sets forth the general rule of liability. The burden is on the State to establish any of the exceptions. *C.J.W. v. State,* 253 Kan. 1, 13, 853 P.2d 4 (1993).

The exception the district court correctly applied here to exclude liability is K.S.A. 75-6104(d):

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

"(d) adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence."

In *Jarboe,* we affirmed summary judgment in favor of the Kansas Department of Social and Rehabilitation Services (SRS) and the Board of Sedgwick County Commissioners against the Jarboes as parents and guardians. The Jarboes' son had been shot and severely injured by a juvenile who had escaped from a youth residence facility. The personal injury action alleged negligent placement and supervision of the juvenile. We reasoned that 75-6104(d) and (e) provided immunity. One of the liability theories was that an SRS caseworker had violated mandatory provisions in the manual by failing to obtain certain records. In analyzing why 75-6104(d) applied, we discussed extensively *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), the legislative history of 75-6104(d), and other cases considering the effect of 75-6104(d). *Jarboe,* 262 Kan. at 626-30.

Fettke contends that 75-6104(d) should not apply because a duty not to disclose his name to the media exists independent of the policy manual. We disagree.

### The Restatement

Fettke asserts that a special relationship existed between himself and the city by virtue of the status of employer-employee and his dangerous work. Fettke relies on Restatement (Second) of Torts § 314B(1) (1963), which provides:

"If a servant, while acting within the scope of his employment, comes into a position of imminent danger of serious harm and this is known to the master or to a person who has duties of management, the master is subject to liability for a failure by himself or by such person to exercise reasonable care to avert the threatened harm."

Restatement (Second) of Torts § 314B is identical to Restatement (Second) of Agency § 512(1) (1957). Comment a to § 512(1) states:

"A servant may be exposed to risk of harm from a cause for which the master is not responsible under such conditions that the threatened servant has no power to save himself. If this becomes known to persons having duties of superintendence, the employer is subject to a duty to take such reasonable measures for relief as may be open. Thus, if a factory catches fire without the fault of the employer, and this comes to the knowledge of the superintendent, he is subject to a duty to take reasonable measures for the escape of the employees from the threatened building."

Section 512(1) seems to embody the common-law duty owed by the master to provide a safe place to work. See Prosser and Keeton on Torts § 80, p. 569 (5th ed. 1984). The whole field of an employer's liability for injuries to employees very largely has been preempted by workers compensation acts. Prosser and Keeton on Torts § 80. Fettke unsuccessfully applied for workers compensation benefits. However, he has obtained a disability retirement.

Recent case law concerning either the Restatement (Second) of Torts § 314B or Restatement (Second) of Agency § 512(1) is sparse, perhaps due to the preemption of this field by workers compensation laws. *Blake v. Consolidated Rail*, 176 Mich. App. 506, 439 N.W.2d 914 (1989), involved a successful claim brought under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* (1988),

against the railroad. The plaintiffs were heirs of three railroad workers murdered by an ex-railroad employee with a long, well-known history for violence against railroad workers. The *Blake* court, citing Restatement (Second) of Torts § 314B and other provisions, decided that the railroad owed a legal duty to provide a safe workplace to the plaintiffs' decedents. 176 Mich. App. at 517.

A contrary result was reached in *Whelan v. Albertson's, Inc.*, 129 Or. App. 501, 879 P.2d 888 (1994). A security guard sued the store owner, the manager, and a co-worker, claiming verbal harassment by the manager and co-worker. The guard had to be reassigned elsewhere because of the harassment. *Whelan* affirmed dismissal of the claim of negligent supervision. Emphasizing the Restatement's requirement of "imminent danger," the *Whelan* court said: "[W]e find that [Restatement (Second) of Torts] section 314B treats the employment relationship as a special one which requires an employer to protect the employee from known, imminent danger of serious harm. Here, plaintiff does not allege that he was ever put in imminent danger of serious harm." 129 Or. App. at 507.

In *Jaindl v. Mohr*, 432 Pa. Super. 220, 637 A.2d 1353 (1994), a secretary sued her employer for malicious prosecution and negligence after she was found not guilty of theft charges brought by her employer. Her negligence claim was based in part on her employer's alleged duty under Restatement (Second) of Torts §§ 314A and B to properly manage the business so that she would not be falsely accused of theft. The claim was dismissed on summary judgment. The *Mohr* court said: "[Restatement (Second) of Torts] Sections 314A and 314B relate only to physical harm caused to an injured employee." 432 Pa. Super. at 225-26.

In *Peterson v. U.S. Reduction Company*, 267 Ill. App. 3d 775, 641 N.E.2d 845 (1994), *lv. to appeal denied* 161 Ill.2d 539 (1995), a replacement trucker employed by a contract trucking company providing trucks during a strike was shot by a sniper and killed while hauling from the plant, even though the plant had provided security forces. The plant had failed to report a shooting incident to the contract trucking company that had occurred 2 days earlier. The plant had also received threats of shooting against replacement drivers, which were not passed on. After the jury returned a verdict

for the driver's wife in a wrongful death action against the plant, the appellate court reversed, finding no duty. *Peterson* addressed the Restatement (Second) of Agency § 512(1), deciding that there was no employer-employee relationship between the plant and the murdered trucker, but even if there had been, § 512(1) would not be helpful. The *Peterson* court said: "We do not believe that the drafters of section 512(1) envisioned that protecting against 'imminent danger' would include warning of an inchoate threat that harm occasioned by the criminal act of an unidentified assailant might occur to an unspecified person at an unspecified time and location." 267 Ill. App. 3d at 782.

Almost every police officer is exposed to the risk of becoming involved in a shootout with a private citizen. Once an officer becomes involved in such an incident, he or she is in danger of the risk of retaliation by relatives, friends, or allies of the shooting victim. Refusal to release the identity of the officer to the media may or may not reduce the risk of retaliation. The media could obtain that information through other channels.

## CONCLUSION

Clearly, Section 706.05 of the policies manual established a policy under which the police department would not release to the media the identity of officers involved in critical incidents, such as the Mitchell shooting. The policy was, at least in part, intended to provide some degree of protection for officers and their families against the risk of retaliation. The city violated this policy by disclosing Fettke's identity to the media shortly after the incident occurred. However, we find no duty not to disclose independent of Section 706.05. We do not minimize the risk of retaliation that any officer involved in a shooting incident faces. However, that risk, under the facts here, does not qualify as "imminent danger" of serious bodily harm, as required in Restatement (Second) of Torts § 314B or Restatement (Second) of Agency § 512. Fettke received verbal threats while on duty. His wife received secondhand threats from co-workers at the hospital. Their children received taunts. The *Blake* case, in which a § 314B duty was imposed, involved a Federal Employers' Liability Act claim and exposure of

railroad workers to harm from a specific ex-railroad employee (who murdered them) with a long, well-known history of violence against other railroad workers. In *Peterson*, which involved the known threat of violence against strike-breaking truck drivers, no duty to protect against sniper fire was imposed on the plant.

Given the lack of any independent duty not to disclose, Fettke's situation fits squarely within the 75-6104(d) exception. The city's cross-appeal asserts an alternative ground for relief and need not be addressed.

Summary judgment for the city is affirmed. Our affirmance disposes of the need to address additional defenses advanced by the city.

Affirmed.

LOCKETT, J., dissenting: Fettke filed a tort action against his employer for damages caused by a breach of his employment contract. The district court, and now the majority, has failed to recognize it as a contract action, instead applying tort law principles. A tort is a violation of a duty imposed by law. *Mills v. City of Overland Park*, 251 Kan. 434, Syl. ¶ 4, 837 P.2d 370 (1992). A contract is an agreement between two or more parties creating a binding obligation. *Railsback v. Raines*, 110 Kan. 220, 222-23, 203 Pac. 687 (1922). On breach of an employment agreement, parties are entitled to such damages as are a necessary result of the breach. *Spencer v. Agnew*, 112 Kan. 182, 184, 210 Pac. 485 (1922). Application of tort law to a contract action is legally impermissible under *Ford Motor Credit Co. v. Suburban Ford*, 237 Kan. 195, 699 P.2d 992, *cert. denied* 474 U.S. 995 (1985). Therefore, I respectfully dissent.

The employment relationship between the City of Wichita (city) and Fettke was governed by the police department Policies and Regulations Manual (Manual). As such, it governs the contractual duties of both parties in their employment relationship. This fact is acknowledged by the majority in the second sentence of its opinion, which states, "The claim is based on a violation of police department policy, *i.e.*, releasing the officer's name to the news media after a fatal shooting."

Because this is a contract action based upon alleged employment rights created under a city policies and regulation manual, it should be analyzed under the rationale of *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987). In *Morriss*, former employees brought an action against their employer and two of its supervisors for wrongful discharge. The former employees claimed the employment manual set forth certain employment rights; therefore, they were not employees-at-will. The employer asserted that because the manual stated nothing in the manual should be construed as a guarantee of employment, the former employees were employees-at-will. The district court granted the employer's motion for summary judgment.

The *Morriss* court observed that where it is alleged that an employment contract is one to be based upon a theory of "implied in fact," the understanding and intent of parties is to be ascertained from several factors, which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time the employment commenced. It noted that every employment contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. 241 Kan. 501, Syl. ¶¶ 1, 2.

The *Morriss* court then reversed the district court's granting of summary judgment, finding that "there was a legitimate issue of fact whether . . . an employee would not be terminated except for just cause" because other facts gave rise to the possibility of the existence of an implied employment contract. 241 Kan. at 513-14.

In the Manual, the city agreed not to release the names of its officers involved in critical incidents. Despite this agreement, the city released Fettke's name after he was involved in a critical shooting incident. Fettke filed a tort action against the city based on breach of the employment contract (the Manual).

Because Fettke filed a tort claim against a governmental entity, the district court mistakenly believed the action was governed by the Kansas Tort Claims Act and determined the Act exempted the city from such claim.

The majority has also been similarly led astray by Fettke's mischaracterization of his claim when filing suit. The confusion caused by the tort claim Fettke mistakenly brought and the breach of contract action he should have brought adds to the trend of Kansas courts to decide all claims against a governmental entity under the Kansas Tort Claims Act umbrella. See *Brock v. Richmond-Berea Cemetery Dist.*, 264 Kan. 613, 957 P.2d 505 (1998) (holdings governmental entity engaged in private proprietary activity exempt from statutorily imposed liability under Kansas Tort Claims Act).

Applying the majority's reasoning, contractual relationships between governmental entities and their employees are governed not by employment contracts, but rather by the Kansas Tort Claims Act. Application of tort law to a contract right interferes with governmental employees' contract rights and is unconstitutional. See U.S. Const., art. I, § 10.