No. 89,775

BARBARA GODLEY AND LYNDA MOORE, *Appellees,* v. VALLEY VIEW STATE BANK; MERRILL LYNCH TRUST COMPANY OF AMERICA; UMB BANK, N.A.; AND THE UNKNOWN HEIRS OF MARIZA V. TOLIVER, DECEASED, *Defendants,* SIGITAS BABARSKAS, *Appellee,* and KATHERINE BRUNI; CHRISTINA TOLIVER; MARK TOLIVER, *Appellants.*

(89 P.3d 595)

Opinion filed May 14, 2004.

*Phillip C. Rouse,* of Douthit, Frets, Rouse & Gentile, L.L.C., of Kansas City, Missouri, argued the cause, and *Jennifer L. Benedict,* of the same firm, was with him on the briefs for appellants.

*Douglas L. Carter,* of Law Offices of Douglas L. Carter, P.C., of Kansas City, Missouri, argued the cause and was on the brief for appellee Sigitas Babarskas.

*Bernard F. Weinand,* of Blackwood, Langworthy & Tyson, L.C., of Kansas City, Missouri, argued the cause and was on the brief for appellees Barbara Godley and Lynda Moore.

The opinion of the court was delivered by

NUSS, J.: This case requires us to review a trust and determine the validity of its purported amendment. Among other things, the

amendment changed the beneficiaries of the original trust. Two of the three new beneficiaries, Barbara Godley and Lynda Moore (plaintiffs), sued the original beneficiaries, Katherine J. Bruni, Christina Toliver, Mark Toliver (defendants), and others and sought a judicial determination that the amendment was valid. The district court agreed with the plaintiffs, granting their motion for summary judgment and denying defendants'.

Defendants timely appealed. We transferred from the Court of Appeals on our own motion pursuant to K.S.A. 20-3018(c).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court err in failing to conclude that the March 25 amendment was invalid? No.

2. Did the district court err in holding the March 25 amendment was executed in compliance with the Original Trust Agreement? No.

Accordingly, the judgment of the district court is affirmed.

FACTS:

The summary judgment motions of the parties established that the material facts are uncontroverted.

On May 13, 1993, Mariza V. Toliver executed a 25-page Trust Agreement creating a revocable trust (Original Trust Agreement). Mariza, as grantor, and Mariza and her husband Jack Toliver, as co-trustees, each signed in those capacities. Article TENTH of the Original Trust Agreement provided: "In the event neither Jack M. Toliver nor Mariza V. Toliver is able to serve as trustees hereunder, then the Overland Park State Bank and Trust Company shall serve as successor trustee hereunder."

Article TWELFTH provided that any successor trustee would have the same powers, authorities, and discretions as though originally named as the trustee:

"All the estate, powers, trusts, duties and discretion anywhere herein created or conferred, shall be held, possessed or exercised by and shall extend to any Trustee hereunder whether such be the Trustee named herein or its successors or substitutes. No bond shall be required in any jurisdiction of any Trustee acting hereunder."

Jack's three children (Mariza's stepchildren) were among those named as remainder beneficiaries: Katherine Bruni, Christina Toliver, and Mark Toliver. Article FIRST specifically addressed beneficiaries at paragraph C:

"C. The property comprising Trust B shall be held, managed, invested and reinvested by the Trustee, and the Trustee shall collect the income therefrom and pay over and distribute the net income and principal thereof as follows:

"1. While Grantor's mother, RUTA BALCIUNAS, is living, the Trustee shall pay over to her not less often than quarter-annually all of the net income of the trust.

"2. Upon the death of Grantor's said mother, or upon Grantor's death, if she does not survive her, the Trustee shall pay over to Grantor's spouse, not less often than quarter-annually, all of the net income of the trust. Upon the death of both RUTA BALCIUNAS and JACK M. TOLIVER, or upon Grantor's death if neither JACK M. TOLIVER nor RUTA BALCIUNAS are then living, the Trustee shall distribute the remaining trust estate in equal shares to KATHERINE J. BRUNI, CHRISTINA TOLIVER and MARK S. TOLIVER, and if any of said persons are not then living, then his or her share shall pass to his or her then-living descendants, per stirpes, and if none, then to the survivors of the above-named beneficiaries, per stirpes."

Mariza's right as grantor to alter, amend, or revoke her Original Trust Agreement was contained in Article FIFTEENTH as follows:

"FIFTEENTH: Grantor expressly reserves the right, at any time and from time to time, to alter, amend and revoke this Agreement, in whole or in part, by duly executed instrument delivered to the Trustee. No amendment shall be made, however, which shall in any way increase the obligations of the Trustee hereunder or change its rights or duties without its written consent. Upon any revocation, the Trustee shall deliver to Grantor, against receipt, any property on hand as to which the Trust has been revoked, together with such supporting instruments as may be necessary to release any interest the Trustee may have in or to such property."

Approximately 5 years later on January 12, 1998, Mariza and Jack placed their notarized signatures on a form published by Merrill Lynch Trust Company of America (Merrill Lynch) captioned Amendment to Revocable Trust Agreement: Appointment of Successor Trustee (January Amendment). The main purpose of signing the form was to name Merrill Lynch as successor trustee, *i.e.*, to replace Overland Park State Bank and Trust Company. The Jan-

uary Amendment addressed this issue in the recitals and in paragraph 1:

"WHEREAS, the Grantor desires to amend the Agreement [Original Trust] to designate a Successor Trustee to succeed the current trustee and to provide for its compensation, and to provide the Successor Trustee with certain additional powers respecting the trust property.

"NOW THEREFORE, the Grantor amends the Agreement to add the following new provisions:

. . . .

"1a. *Appointment of Successor Trustee.*

"Merrill Lynch Trust Company of America, an Illinois corporation, . . . *is appointed as Successor Trustee* . . . to succeed the current trustee and to serve hereunder pursuant to the terms of the Agreement [Original Trust]. *This appointment shall become effective upon the resignation, removal, disability or death of the current trustee.*" (Emphasis added.)

Less than 1 month later, on or about February 8, 1998, Jack died. His death left Mariza as the sole trustee. Merrill Lynch remained the ostensible successor trustee, effective upon Mariza's resignation, removal, disability, or death.

Approximately 6 weeks after Jack's death, on or about March 25, 1998, Mariza placed her notarized signature as grantor on a 39-page document entitled "Amendment and Restatement of Mariza V. Toliver Revocable Trust Agreement of May 13, 1993" (March Amendment). Among other things, the March Amendment removed Mariza's stepchildren as the remainder beneficiaries. It replaced them with two of Mariza's caregivers, Lynda Moore and Barbara Godley — who were each to receive one-fourth of the residuary estate — and a third individual, Sigitas Babarskas, who was to receive one-half. The March Amendment also named Merrill Lynch as the trustee, and essentially relieved Mariza of any trustee duties.

Charles Hammond, the counsel who created the March Amendment for Mariza, intended to have Merrill Lynch execute it before a notary so he included a signature block for Merrill Lynch and a notary block. Once Mariza's notarized signature was obtained, the March Amendment was delivered to Merrill Lynch.

According to Hammond, he had been assured by Merrill Lynch's Lewis Gregory and others that Merrill Lynch would sign. As a

result, since Merrill Lynch had still not executed it as trustee by April 15, 1998, Hammond sent a letter on that date to Gregory stating:

"Dear Lewis:

"I am concerned that the trust agreement of Mariza Tolive[r] has not yet been executed as you advised in our telephone conversation of this date. Although Mariza Toliver is presently living, I am concerned that her death is imminent and without the trust having been executed, *there may be an issue relating to its validity.*

"I encourage you to review the status of the execution immediately so that the trust may be executed without further delay.

"Sincerely,
[Signed]
"Charles E. Hammond" (Emphasis added.)

Mariza died that day. Two days later, on April 17, Merrill Lynch surprised Hammond by "declining" not only the position of trustee under the Original Trust Agreement per the March Amendment but also the position of successor trustee under the January Amendment. Its Declination of Office to Act stated:

"MERRILL LYNCH TRUST COMPANY OF AMERICA, by its duly authorized officer, hereby [1] declines the office of Trustee of the Mariza V. Toliver Revocable Trust Agreement U/A/D May 13, 1993 and as amended and restated and [2] further declines the office of Successor Trustee of the Mariza V. Toliver Revocable Trust Agreement pursuant to an amendment dated January 12, 1998."

Accordingly, Merrill Lynch never placed its signature, notarized or not, on the March Amendment.

Article ELEVENTH of the March Amendment empowered a majority of the beneficiaries to appoint a successor trustee in the event of a trustee's resignation or removal. It also provided that any successor trustee would have the same powers, authorities, and discretions as though originally named as the trustee. Like Article TWELFTH in the Original Trust Agreement, Article THIRTEENTH affirmed this concept.

"All the estate, powers, trusts, duties, and discretion anywhere herein created or conferred, shall be held, possessed or exercised by and shall be extended to any Trustee hereunder, *whether such be the Trustee named herein or its successors or substitutes.* No bond shall be required in any jurisdiction of any Trustee acting hereunder." (Emphasis added.)

Pursuant to Article ELEVENTH, on May 1, 1998, 16 days after Mariza's death, since Mariza had died and Merrill Lynch had "declined," two of the three new beneficiaries, Barbara Godley and Lynda Moore, executed a document entitled Direction with Respect to Successor Trustee, in which they appointed Valley View State Bank (Valley View) as successor trustee. On that same day, Valley View accepted the office of successor trustee under the March Amendment.

On October 22, 1999, Godley and Moore filed a declaratory judgment action seeking a judicial determination of the March Amendment's validity. Although the resultant motions for summary judgment presented Mariza's competence as a controverted fact, by the time of oral argument there was no longer any dispute about her mental capacity, nor was there any allegation of her operating under undue influence at the time she executed the March Amendment. The district court held in favor of the plaintiffs on September 24, 2002, and the defendants appealed.

ANALYSIS:

The district court granted summary judgment to plaintiffs, and there is no dispute regarding the material facts on appeal. Accordingly, our review is de novo. *Duarte v. DeBruce Grain, Inc.*, 276 Kan. 598, 602, 78 P.3d 428 (2003). Moreover, determining the nature, construction, and legal effect of a trust is a question of law over which we have unlimited review. *State ex rel. Secretary of SRS v. Jackson*, 249 Kan. 635, 641, 822 P.2d 1033 (1991).

Our review of the trust is also governed by the recognition that the primary objective of trust law is to carry out the settlor's intent. See English, *The Kansas Uniform Trust Code*, 51 U. Kan. L. Rev. 311, 328 (2003). Consequently,

"[i]f the text of the trust indenture is plain and unambiguous, the intent of the trustor (settlor) can be ascertained from the language used. [Citation omitted.] Where construction is necessary [however] the court must put itself in the situation of the trustor when the trustor made the trust instrument and, from consideration of the language used in the entire instrument determine the intention of the trustor. [Citations omitted.] The cardinal rule is that the intention of the trustor as gathered from the whole instrument must control unless contrary to

settled principles of law." *In re Estate of Pickrell*, 248 Kan. 247, 806 P.2d 1007 (1991).

During our review, we will not apply the provisions of the Kansas Uniform Trust Code (KUTC), K.S.A. 2003 Supp. 58a-101 *et seq.*, which became effective on January 1, 2003, approximately 3½ months after the district court's journal entry was filed. We decline because we agree with defendants that the KUTC's possible application was not raised in this case until the plaintiffs' response brief was filed on November 13, 2003. We also decline because we agree with defendants that applying the KUTC would prejudice their rights, *i.e.*, they would be replaced as residuary beneficiaries. See K.S.A. 2003 Supp. 58a-1106(a)(3) (KUTC applies to judicial proceedings concerning trusts commenced before its effective date unless the court finds that application of a particular provision of this act would prejudice the rights of the parties, in which case the particular provision of this act does not apply and the superseded law applies.).

Issue 1: *Did the district court err in failing to conclude that the March Amendment was invalid?*

Defendants first characterize the March 25, 1998, document — the March Amendment — as a "bilateral trust agreement" that consequently should be controlled by general contract principles. Accordingly, they argue it was invalid because it was not signed, *i.e.*, agreed to, by one of the two parties to the purported contract, the trustee. They point to language in the document that states it is being reached "by and between" Mariza as grantor and Merrill Lynch as trustee and that states in several places it is an "agreement." Defendants also focus on the signature blocks for Mariza as "Grantor" and Merrill Lynch as "Trustee." Their supporting authorities include *Denny v. Guarantee Title & Trust Co.*, 118 Kan. 286, 234 Pac. 966 (1925), where a named trustee's failure to accept the trust in writing, as required by the terms of the trust document, rendered the trust contract unenforceable.

They also point out that in Kansas trust law, the essential elements of an express trust have been (1) an explicit declaration and intention to create a trust, (2) definite property or subject matter

of the trust, and (3) *the acceptance and handling of the subject matter by the trustee as a trust. In re Estate of Ingram,* 212 Kan. 218, Syl. ¶ 4, 510 P.2d 597 (1973); *Shumway v. Shumway,* 141 Kan. 835, Syl. ¶, 44 P.2d 247 (1935). According to the defendants, Merrill Lynch never accepted or handled the subject matter. They conclude that since this essential element is missing, the bilateral trust agreement must fail.

We disagree with defendants' characterization and resultant conclusions for several reasons.

First, while *Ingram* and *Shumway* provide that an express trust cannot be created without all three elements, here all three elements were present when the trust was created in 1993. In particular, Mariza and Jack both signed as trustees accepting the trust. Moreover, the 1998 document does not purport to create a new trust, but rather to "amend and restate" the original trust. It is captioned: *"Amendment and Restatement* of Mariza V. Toliver Revocable Trust Agreement of May 13, 1993." (Emphasis added.) Additionally, it provides in the Recitals that "the Grantor now desires to amend, restate and republish" the Original Trust Agreement. Furthermore, Article FIFTEENTH of the Original Trust Agreement empowered the grantor, Mariza, to amend and restate: "Grantor expressly reserves the right . . . to alter, amend, and revoke this Agreement, *in whole or in part."* (Emphasis added.)

Second, we reject defendants' invitation to apply all the same standard rules of contract law, to trust amendments, that we may have applied to trust creations. Their authorities, *e.g., First Nat. Bank of Kansas City v. Wheeler,* 557 S.W.2d 639 (Mo. App. 1977), and *Denny v. Guarantee Title & Trust Co.,* 118 Kan. 286, concern only trust creations and are inapplicable. Defendants have provided no legal authority for their specific proposition, despite their notification from the district court almost 18 months before the case was argued before this court. The court's September 24, 2002, journal entry stated: "Significantly, defendants cite no cases wherein a *trust amendment* failed for lack of a co-trustee or successor trustee's acceptance." Additionally, we observe that under the KUTC (which we are not applying), trustee acceptance apparently is no longer even necessary for the *creation* of a trust. See,

K.S.A. 2003 Supp. 58a-401; K.S.A. 2003 Supp. 58a-402; English, *The Kansas Uniform Trust Code*, 51 U. Kan. L. Rev. 311, 327 (2003).

Third, we observe that the March Amendment's specific naming of Merrill Lynch as trustee — which defendants argue required Merrill Lynch's written acceptance — was a redundancy. Per the January Amendment naming Merrill Lynch the successor trustee, Merrill Lynch had automatically succeeded Mariza as trustee once she essentially resigned as sole trustee (after Jack's death) by executing the Amendment on March 25. See 76 Am Jur 2d, Trusts § 252 (disclaimer of the position of trustee requires no specific formality to be effective, and conduct will suffice). The January Amendment, *i.e.*, Merrill Lynch's printed form, stated that Merrill Lynch *"is appointed as Successor Trustee . . .* to succeed the current trustee and to serve hereunder pursuant to the terms of the [Original Trust] Agreement. *This appointment shall become effective upon the resignation, removal, disability or death of the current trustee."* (Emphasis added.)

At a minimum, Merrill Lynch had automatically succeeded Mariza as trustee upon her death on April 15 and remained so until its "declination" — more accurately characterized as its resignation from its present position as sole trustee.

In short, based upon the record before us, there was no requirement for Merrill Lynch to sign the March Amendment to agree to serve as a trustee. Per the January Amendment (Merrill Lynch's own form), it had already stepped into this role upon Mariza's resignation or certainly upon her death. As explained below, however, Merrill Lynch still had the right to later resign, *e.g.*, because the Amendment increased its obligations.

Issue 2: *Did the district court err in holding the March Amendment was executed in compliance with the Original Trust Agreement, i.e., is the amendment valid?*

The defendants next argue that the March Amendment is invalid for reasons they assert are separate from those advanced in issue 1. Specifically, they claim Mariza failed to comply with the particular conditions for altering or amending the Original Trust Agree-

ment. They point to the first two sentences of Article FIF-TEENTH of the document which they construe to set forth those conditions.

"FIFTEENTH: Grantor expressly reserves the right, at any time and from time to time, to alter, amend and revoke this Agreement, in whole or in part, [1] by duly executed instrument delivered to the Trustee. [2] No amendment shall be made, however, which shall in any way increase the obligations of the Trustee hereunder or change its rights or duties without its written consent."

In an argument that somewhat overlaps the defendants' assertion in issue 1 above, they urge us to accept their construction which makes the March Amendment invalid because Merrill Lynch did not sign or accept it — contrary to the purported requirements in condition one. They also urge us to accept their construction which makes the entire 39-page March Amendment ineffective because it increased Merrill Lynch's obligations as trustee without Merrill Lynch's written consent — contrary to the purported requirements in condition 2.

The plaintiffs, on the other hand, urge us to accept their construction which makes the March Amendment valid and complete when Mariza placed her notarized signature on it and delivered it to either herself, as present trustee, or to Merrill Lynch, as the new trustee. They also urge us to accept their construction which makes the second condition merely a safeguard for Merrill Lynch, simply allowing it to refuse service as a trustee under increased obligations. According to plaintiffs, Merrill Lynch's refusal has no bearing on the validity of the amendment, e.g., the change in beneficiaries. As a result, a majority of the new beneficiaries can appoint the new trustee, Valley View, upon Merrill Lynch's resignation or refusal to serve as trustee.

Our determination of this issue requires a review of pre-KUTC Kansas trust law. Per K.S.A. 58-2417 — in effect at the time of the Original Trust Agreement's creation — the power to revoke or modify must be reserved in the Original Trust Agreement. Moreover, "[i]f the settlor reserves a power to modify the trust only in a particular manner or under particular circumstances, he can modify the trust only in that manner or under those circum-

stances." Restatement of Trusts (Second) § 331(1), comment d (1957). See *In re Estate of Sanders*, 261 Kan. 176, 182, 190, 929 P.2d 153 (1996) (where a trust document contains specific provisions to be complied with, they are required to be followed).

No Kansas courts have directly addressed trust language similar to Article FIFTEENTH which contains the conditions defendants allege. We find *Woodward v. Ameritrust Co.*, 751 F.2d 157 (6th Cir. 1984), however, quite similar and persuasive on both conditions.

In *Woodward*, the appellant had sought a declaratory judgment holding that she was the sole life tenant of an inter vivos trust which was created by her mother, Blanche Woodward, and that an attempted amendment to the trust altering her status was ineffective. The mother had established the trust in 1969 with Ameritrust Corporation as trustee and the mother and daughter as sole beneficiaries. Mother was to receive the income from the trust for life, with the remainder paid to daughter. The mother expressly retained the power to revoke or amend the trust as follows:

"Grantor further reserves the right to amend any provision of this Trust Agreement at any time during her lifetime *by filing a written amendment with the Trustee; but if the Trustee does not consent to such amendment, the Trustee may terminate the Trust and return all of the Trust Estate to the grantor.* At the death of the Grantor, this Trust shall become irrevocable." (Emphasis added.) 751 F.2d at 158.

In July 1973, mother exercised her power to amend by delivering a written instrument to Ameritrust signed by both mother and Ameritrust. The amendment provided that upon her death the income was to go to her husband for life; upon his death the income was to go to the daughter for life.

When the husband preceded the mother in death, she executed a formal second amendment to the trust in November 1975. While mother again retained her life interest in the trust, she added successive life interests in her two sisters after her own. The daughter, as a remainder beneficiary, was also granted a life estate with a limited right to invade the principal, but it became effective only after the interests of her mother's two sisters.

Mother signed and mailed the amendment to Ameritrust on November 4, 1975. As in the instant case, despite the absence of trust language requiring the trustee's execution of the amendment, her counsel enclosed a letter requesting Ameritrust "execute" both originals and return one "fully executed." However, on November 14, Ameritrust returned the two unexecuted duplicate originals to her counsel along with a letter providing that its counsel had various "comments" to make concerning the "proposed second amendment."

Mother died on December 18, 1975, and the next month her counsel again sent the original second amendment, signed by mother in November 1975, to Ameritrust requesting execution with a copy returned. Ameritrust signed it approximately 2 months later on February 23, 1976, continuously acted under the terms of the second amendment, and never attempted to terminate the relationship.

The narrow question on appeal, after summary judgment against the daughter, was whether the second amendment sent to, but not signed by, Ameritrust on November 4, 1975, effected a valid modification of the trust. The court first noted that Ohio law, like that of Kansas, provides that the settlor of an inter vivos trust may reserve various rights and powers in relation to the trust estate. In acting to exercise any of these reserved rights, however, the settlor must act as provided in the reservation. 751 F.2d at 160 (citing, *inter alia,* Restatement [Second] of Trusts § 331, comment d [1957]).

Somewhat similar to the defendants in the instant case, the daughter argued that to amend the trust, two separate conditions had to have been met; first, mother had to file a written amendment with the trustee and second, the trustee had to "consent to such amendment." Because under the facts no consent was given by the trustee during mother's lifetime, daughter contended that the second amendment was never effectuated.

In response, Ameritrust asserted that only one condition was needed to amend the trust: the grantor file "a written amendment with the Trustee." 751 F.2d at 160. The amendment was effective at that point, whether the Trustee consented or not. Ameritrust

contended that the trust's consent provision "merely provided the trustee with a means to avoid being bound by harsh, unwanted amendments, and a means to terminate its trusteeship in that event." 751 F.2d at 160.

The court held:

"We agree [with Ameritrust]. *Ameritrust's termination of its interest, in our view, would not affect the validity of any properly executed single amendment, nor would it necessarily revoke and/or bring to an end the entire trust.* [holding in fn. 7 that 'upon termination of the trusteeship, a new trustee could always be appointed'.] *Under the undisputed facts as they exist in this case, a written amendment was filed with Ameritrust during Blanche's [mother] lifetime. The amendment then immediately became effective even though Ameritrust had suggestions for purported improvements in carrying out Blanche's purposes.* Ameritrust then had, but failed to exercise, the right to terminate its trusteeship. The fact that Ameritrust sent the second amendment back, unexecuted, with comments for revision is irrelevant to our determination of a valid execution and delivery of the amendment in question.

"We therefore agree with the district court that there was only one condition precedent to the amendment of the Trust; *that the settlor file 'a written amendment with the Trustee.'* The execution and delivery effectuated a filing of the amendment with Ameritrust, the trustee, which then continued to serve in that capacity without any effort to terminate its trusteeship or to 'terminate' the carrying out of the amended trust provisions." (Emphasis added.) 751 F.2d at 160.

The *Woodward* court held that the actions of mother's legal counsel and Ameritrust, again similar to the actions of Mariza's counsel in the instant case, were irrelevant. While they both acted as if the original second amendment signed and filed by mother was not effective until consented to by Ameritrust, and that amendment was also drawn with signature lines for Ameritrust, the court concluded it was unnecessary to look at these extrinsic facts to decide the case because the language of the trust was unambiguous. Such extrinsic evidence was admissible only where the language was either uncertain or ambiguous. 751 F.2d at 161 (citing Restatement [Second] of Trusts § 38, comment a).

· Similar to the *Woodward* court's reading of its trust language, we hold our Article FIFTEENTH does not provide the trustee with power to veto, through its failure to execute the amendment as requested by counsel, the settlor's right to modify her estate plan for the disposition of her property. Defendant's contrary con-

struction renders the article's second sentence superfluous; if the trustee can essentially veto any amendment by simply refusing to "duly execute" for any reason, or for no reason at all, there is no need for the specific veto power in the second sentence which is limited to when the trustee's obligations increase or its rights or duties change. When construing a trust, a court must consider language in the entire instrument. *In re Estate of Pickrell*, 248 Kan. 247, 255, 806 P.2d 1007 (1991).

Likewise, our Article FIFTEENTH does not provide the trustee with power to veto, through a failure to consent because of its increased obligations or changes in its rights or duties, the settlor's right to modify her estate plan for the disposition of her property. Rather, if the trustee does not desire to accept these changes, it has the right to simply refuse to accept them, leaving the amendment intact and requiring the settlor, or her designated agent, to appoint another trustee. 751 F.2d at 160 n.7. In short, this second sentence exists to protect the trustee. Despite defendants' argument and citation to *Cole v. Cole,* 317 Mont. 197, 75 P.3d 1280 (2003), it does not exist to protect Mariza from the consequences of her whim, caprice, or momentary indecision, or from the undue influence by other persons.

Like *Woodward,* the case of *In re Estate of Mueller,* 933 S.W.2d 903 (Mo. App. 1996), also addresses both of the purported conditions in Article FIFTEENTH in the instant case. More important, it clearly illustrates the problem when a trustee simply refuses to agree to an amendment and thereby threatens to destroy a settlor's estate plan.

There, on August 30, 1989, Emma Mae Mueller created a revocable living trust naming Gary Johnson trustee. Section IX, subsection (c) provided: "The Grantor may at any time, or from time to time, by instrument in writing executed by Grantor and delivered to *and executed by the Trustee,* amend, alter or modify this Indenture, or revoke any amendments hereto." (Emphasis added.) 933 S.W.2d at 904.

Approximately 3 years later, on September 21, 1992, Mueller executed an amendment to her trust. While Johnson remained trustee and a remainder beneficiary who would share equally with

other beneficiaries in the estate following her death, the amendment decreased the remainder estate, resulting in less principal and income to Johnson. He told Mueller that he was upset with the September 21 amendment because his share of the estate would be diminished. As a result, he refused to execute the amendment. Mueller then died.

Johnson argued that because he never executed the amendment as required under the terms of the trust, the trust was never properly amended. According to him, the trust should have been administered in accordance with the terms of the original August 30, 1989, trust, thus restoring his lost principal and income.

The Court of Appeals acknowledged that Missouri law (like Kansas law and *Woodward's* Ohio law) provided that if the settlor reserves a power to modify the trust only in a particular manner or under particular circumstances, he can modify the trust only in that manner or under those circumstances (citing, *inter alia*, Restatement of Trusts 2d § 331[1], comment d (1957). It then rejected Johnson's position, stating:

"Section IX(c) did not grant the trustee the power to veto modifications of the trust's terms. Johnson's discretionary powers as trustee did not apply to the power decedent reserved to herself to amend, alter and modify the trust. Whether Johnson approved of an amendment or not, he was powerless to withhold execution of the amendment." 933 S.W.2d at 907.

Accordingly, the court found the amendment was effective upon execution by Mueller, despite its apparent signature line for Johnson as trustee.

While we concede that *Mueller's* overreaching trustee is not present in the instant case, its general principle remains valid. A trustee's noncooperation should not be allowed to destroy a settlor's modification to her estate plan, particularly when, like here, the settlor has died, and where neither undue influence nor the settlor's mental capacity is an issue. This principle applies whether the trustee refuses to sign because of financial overreaching (*Mueller*), or simply delays signature until after the settlor's death because of comments about the proposed amendment (*Woodward*).

The principle also applies when the trustee refuses to sign for no reason whatsoever. Here, the record does not disclose why Merrill Lynch was noncooperative. It does disclose, however, that after being named successor trustee in January; after assuring Mariza's counsel it would execute the March Amendment; and after becoming sole trustee upon either Mariza's resignation on March 25, or upon her death on April 15, Merrill Lynch then "declined" to serve without providing any reason.

Inherent, but unstated, in our defendants' construction is the argument that this one-time, unexplained, post-settlor's-death declination by one trustee essentially destroyed any possibility of the amendment ever becoming effective, *i.e.*, by another trustee consenting to the alleged increased obligations (as was actually done by Valley View merely 16 days after Mariza's death). Stated a slightly different way, the entire amendment had been invalid since its creation and would remain so until a trustee were to validate it by consenting in writing to the alleged increased obligations. Since Merrill Lynch declined, the amendment remained void forever.

In light of our earlier holding that the March Amendment is not a bilateral contract whose offer expired upon Mariza's death, the Amendment's life did not end with hers. See *Woodward,* 751 F.2d at 160. It could still be accepted by a trustee — and was accepted. This conclusion is also consistent with Mariza's chosen language in not only the Original Trust Agreement, Articles TENTH and TWELFTH, but also the March Amendment, Articles ELEVENTH and THIRTEENTH. These articles provide that if for some reason the designated trustee cannot or will not serve, regardless of reason, the successors will be chosen as prescribed and they will have the same powers as the original trustees. In short, they clearly contemplate that the trust and its amendments have more than one chance for trustee acceptance. Unlike the defendants' construction, plaintiffs' construction therefore considers more than just Article FIFTEENTH in isolation from the entire document. See *In re Estate of Pickrell,* 248 Kan. at 255.

Plaintiffs' construction also supports the primary objective of trust law: to carry out the settlor's intent. English, *The Kansas Uniform Trust Code,* 51 U. Kan. L. Rev. 311, 328 (2003). Here, Mariza

created a 25-page revocable trust in 1993, serving with her husband as a co-trustee and naming Overland Park State Bank and Trust Company as successor trustee. It cannot be seriously argued that Mariza intended, under these circumstances, to empower a successor trustee whose specific nomination she had not even contemplated at the time to — 5 years later — destroy her modified estate plan 2 days after her death for no reason, or merely because the trustee's obligations arguably had increased.

In conclusion, the March Amendment was effective upon the notarized signature of Mariza and delivery to the then trustee, Merrill Lynch. Per Article FIFTEENTH, Mariza performed all the steps required by the trust to amend it. *Cf. State Bank of Parsons v. First National Bank in Wichita,* 210 Kan. 647, 651, 504 P.2d 156 (1972). Merrill Lynch's declination to continue serving as trustee, *i.e.,* its resignation, does not invalidate the remaining 39 pages of the amendment, *e.g.,* the naming of new beneficiaries and removal of the old.

Affirmed.