No. 92,230

MARIE M. MCGINLEY, *Appellant,* v. BANK OF AMERICA, N.A.,
*Appellee.*

109 P.3d 1146

Opin-
ion filed April 22, 2005.

*Phillip L. Turner,* of Turner & Turner, of Topeka, argued the cause, and *Dan E. Turner,* of the same firm, and *Don Hoffman* and *Jason Hoffman,* of Hoffman & Hoffman, of Topeka, were with him on the brief for appellant.

*Steven E. Mauer,* of Bryan Cave, LLP, of Kansas City, Missouri, argued the cause, and *Rebecca S. Jelinek, Robert J. Hoffman,* and *Jennifer A. Donnelli,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J: This case requires us to review a revocable trust instrument and a subsequent letter from the grantor to the trustee. Seven months after Marie McGinley established her trust with Bank of America, N.A., (Bank) as trustee, she signed a letter directing the Bank to retain Enron stock held in the trust. The letter also stated that McGinley agreed to exonerate the Bank from any loss it sustained for continuing to retain the stock and that she relieved the Bank from any responsibility for analyzing and monitoring that stock.

Years later when the value of the Enron stock decreased significantly, McGinley sued the Bank for the amount of lost value. She alleged nine counts including, among others, breach of fiduciary duty, negligent failure to supervise employees, breach of loyalty, tortious conduct of Bank employees, violations of the Kansas Consumer Protection Act, and fraud and misrepresentation by silence.

The district court granted the Bank's motion for summary judgment. McGinley timely appealed, and we transferred from the Court of Appeals on our own motion pursuant to K.S.A. 20-3018(c).

McGinley raises the following arguments in her brief:

1. The letter and its exculpatory provision were invalid because the Bank failed to adequately communicate and explain them to McGinley. Specifically, the letter is ineffective as a trust amendment, *i.e.*, there is no clear and convincing evidence that McGinley intended so because it was written by the Bank on its own initiative and because of the Bank's other conduct.

2. The exculpatory provision is invalid because of the Bank's failure to adequately communicate its contents and effect to McGinley.

3. Even if the exculpatory provision is valid, the Bank's failure to recommend portfolio diversification lacked good faith and was indifferent to McGinley's best interest which places its conduct beyond the provision's reach. Specifically, when the Bank failed to disclose to McGinley its evaluation of her trust being overconcentrated and failed to recommend diversification, the Bank was reckless and indifferent to McGinley's best interest. Additionally, McGinley specifically asked the Bank for its professional advice as to which stocks to sell and keep in 2000, and the Bank failed to disclose that in its professional opinion the Enron investment should be lowered to less than 15% of the value of the trust.

Despite these specific arguments, the core issue is whether the language in McGinley's trust instrument and subsequent letter shield the trustee Bank from liability. We hold the Bank is shielded and affirm the district court.

## FACTS

The material facts, including those expressly determined by the district court as its findings of fact, are undisputed. On November

9, 1990, 79-year-old Marie McGinley established the Marie McGinley Revocable Trust (the trust), with Bank of America, N.A., serving as trustee. McGinley signed the instrument as grantor, the Bank signed as trustee, and her husband Francis signed expressing his consent to its provisions. The trust instrument, as well as a revocable trust instrument for Francis, were drafted by the McGinleys' legal counsel.

The trust was revocable at Marie McGinley's sole discretion. Article III, Revocability, states in relevant part:

"During the lifetime of Grantor *this trust shall be and remain revocable, with Grantor hereby reserving the right and power, at Grantor's discretion, to revoke, alter, amend, modify or change this trust indenture,* in whole or in part, at any time and from time to time, without the consent of the Trustee, any beneficiary or any other person or persons by written notification to Trustee." (Emphasis added.)

The trust was for McGinley's benefit, with funds to be provided to her at her request. Article V, Trust for Benefit of Grantor, states in relevant part:

"During the lifetime of the Grantor, *the Trustee shall pay to the Grantor as much of the net income of the trust as may be requested by the Grantor.* Such payments thereof, in the absence of the agreement otherwise by the Grantor and the trustee, to be made monthly.

"Should the Grantor at any time request the Trustee, or should the Grantor become mentally or physically incapacitated, *the Trustee hereunder is hereby authorized and empowered to use and expend from either principal or income, directly in and about for her maintenance and support, without the intervention of a Conservator or Committee,* and said Trustee shall be liberal in determining the needs of the Grantor." (Emphasis added.)

The trust provided the Bank, as trustee, with certain discretionary powers. Article VIII, Powers of the Trustee, states in relevant part:

"In addition to the powers conferred by common law, by statute, and by other provisions hereof, the Trustee and all Successor Trustees of all the trusts created hereunder, without application to or approval by any Court, *shall have the following discretionary powers and authority.*

"A. *To manage, care for and protect the entire trust estate in accordance with its best judgment and discretion and to collect the income and profits therefrom, and to hold and retain any of the property coming into its hands hereunder* in the same form of investment as that in which it is received by it, although it may

not be of the character of investments otherwise permitted by law to Trustees. *It shall also have full power and authority to insure against loss, improve, sell, lease, mortgage or exchange the whole or any part of such property, whether real or personal, on such terms and conditions as to it deems advisable, and to invest and reinvest any of the trust corpus held hereunder, in such amounts as it sees fit, in such property, real or personal, as it deems advisable* although the same may not be of the character permitted for Trustees' investment by the ordinary rules of law." (Emphasis added.)

These trustee discretionary powers contained some restrictions, however, as Article VIII. A went on to reserve to McGinley the exclusive power to control all purchases and sales of trust assets. It states that

"provided, however, that during the lifetime of Grantor, [s]*he shall be consulted by the Trustee as to any purchase or sale, and the Trustee shall abide by the Grantor's decision* unless, in the sole opinion of the Trustee, the Grantor is incapable of managing [her] affairs, in which event the decision of the Trustee as to all investment matters shall be final and conclusive." (Emphasis added.)

Later, shares of Enron stock previously purchased by McGinley were transferred into the trust with other assets. Approximately 7 months after the trust instrument was signed, a form letter bearing the signature "Marie M. McGinley" and dated June 21, 1991, was apparently delivered to the Bank by her husband. Titled "Direction by Powerholder to Retain Securities," the letter was addressed to the Bank. The district court made a finding of fact, which McGinley does not dispute on appeal, that the letter was issued in accordance with Article VIII of the trust. In language the parties characterize as "directive" the letter stated:

"I hereby direct you to continue to retain the following securities as assets of the above referenced account:

| "Shares or Par Value | Security Name |
| --- | --- |
| "1,541 shares | Enron Corp." |

In language McGinley characterizes as "exculpatory" the letter went on to state:

"*I understand that you do not monitor these securities, and I hereby agree to exonerate, indemnify and hold the Bank harmless from any and all loss, damage and expense sustained or incurred by the Bank for continuing to retain these securities as assets of this account. I also relieve the Bank from any responsibility*

*for analyzing or monitoring these securities in any way.* I hereby bind all beneficiaries of the designated account, my heirs, my executors, and my assigns to the terms of this letter. This release and indemnification will remain in force and effect until my death, my disability (as determined in accordance with the trust agreement) or my written revocation of this letter." (Emphasis added.)

McGinley amended her trust in February 1996 via an instrument drafted by her legal counsel but essentially reaffirmed the provisions of Articles III, V, and VIII. The amendment made no reference to the June 21, 1991, letter.

The value of the Enron stock substantially increased from 1991 through 2000. All increases in the number of Enron shares were the result of stock splits, as the Bank never purchased Enron stock for the trust. At the apparent height in value, December 29, 2000, the trust contained 9,500 shares of Enron stock valued at $789,687.50 and representing approximately 77% of the total market value of the trust.

Because of declines in Enron stock value, by March 30, 2001, the shares amounted to approximately 66% of the total market value of the trust; by June 29, 2001, approximately 64%; by September 28, 2001, approximately 50%; and by December 31, 2001, approximately 2%. By the latter date, the trust contained 8,000 shares of Enron stock valued at only $4,800.

McGinley never revoked the June 21 letter, nor did she ever advise the Bank to continue to hold the Enron stock in her trust. At all relevant times, she was capable of managing her own affairs. The Bank continues to act as trustee of her trust and as trustee of Francis' trust, of which McGinley is a beneficiary.

On January 3, 2003, after the continued substantial decline in Enron stock value, McGinley sued the Bank. On March 22, 2004, the district court granted summary judgment to the Bank, summarizing its four pages of conclusions of law as follows:

"In sum, Plaintiff, through the Directive, explicitly released Defendant from any liability resulting from retention of the stock as well as from any responsibility for monitoring or analyzing the stock. The release is in writing and contains Plaintiff's signature. In addition, the release is to be effective until Plaintiff's death, · disability, or written revocation, none of which has occurred. Nor has Plaintiff shown that the Directive is legally ineffective. Accordingly, the Directive must

stand and Defendant cannot be held liable for retaining the stock or for failing to analyze or monitor the Enron stock in the Trust."

## ANALYSIS

### Standard of review

McGinley does not dispute the district court's factual findings. Accordingly, our standard of review is de novo. *Ekan Properties v. Wilhm*, 262 Kan. 495, 501, 939 P.2d 918 (1997) (The trial court's granting of summary judgment, based on undisputed facts, is a ruling of law, and this court's standard of review is de novo.). Likewise, the interpretation and legal effect of written instruments are matters of law over which this court has unlimited review. *Stone v. U.S.D. No. 222*, 278 Kan. 166, 178-79, 91 P.3d 1194 (2004) (citing *Kansas Gas & Electric Co. v. Will Investments, Inc.*, 261 Kan. 125, 128, 928 P.2d 73 [1996]).

### The statutes

As mentioned, the core issue on appeal is whether the language in McGinley's trust instrument and subsequent letter shield the trustee Bank from liability for its inaction. Consequently, before we embark upon a detailed analysis of McGinley's specific claims, an overview is in order.

The crucial events in this case occurred during an 11- to 12-year period: from the creation of the trust in 1990, through the June 21 letter in 1991, and through the Bank's subsequent failures to diversify the trust portfolio and to advise McGinley of the Enron stock value — especially after 2000 when the value steadily decreased. Consequently, some confusion may exist over which particular versions of the statutes applied to the numerous allegations that McGinley makes for this lengthy period. As discussed below, we need not make these specific determinations since, regardless of which of the particular laws applied, the Bank is shielded from liability. The relevant laws are contained in two categories: (1) the "general trustee powers" law and (2) the accompanying "prudent investor" law.

### 1990

The general trustee powers law in effect at the time of the trust's creation in 1990 was K.S.A. 58-1201 *et seq.*, the Uniform Trustees'

Powers Act (Act). Part of that act, K.S.A. 1968 Supp. 58-1208, described those trusts to which it applied and stated in relevant part:

"(a) Except as herein specifically provided in subsection (b) of this section [testamentary trusts] or as specifically provided in the trust, the provisions of this act apply to any trust established after the effective date of this act [1968], and in the case of any trust established after the effective date of this act, to any trust asset acquired by the trustee."

K.S.A. 1972 Supp. 58-1202 concerned the trustees' powers under the Act. It stated in relevant part:

"(a) The trustee has all powers conferred upon him by the provisions of this act *unless limited in the trust instrument.*

. . . .

"(c) *Unless the [trust] instrument expressly states otherwise* the prudent man rule, as expressed in K.S.A. 17-5004, shall apply as the standard for the exercise of the powers conferred upon a trustee by the uniform trustees' powers act." (Emphasis added.)

The accompanying prudent investor law in effect in 1990, K.S.A. 1987 Supp. 17-5004, described the "prudent man rule" in subsection (a)(1):

"In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary shall exercise the judgment and care under the circumstances then prevailing, *which persons of prudence, discretion and intelligence exercise in the management of their own affairs . . . .*" (Emphasis added.)

However, subsection (c) acknowledged per se compliance with the prudent man rule in revocable trusts in certain instances. It provides:

"In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property of a trust which is revocable or amendable, *a trustee following written directions regarding the property of the trust that are received by the trustee from the person or persons then having the power to revoke or amend the trust . . . shall be deemed to have complied with the foregoing standards provided in subsection (a)* [prudent investor]. *The trustee is authorized to follow such written directions* regardless of any fiduciary obligations to which the directing party may also be subject." (Emphasis added.)

*1993*

Relevant changes in the two categories — general trustee powers and the prudent man rule — occurred in 1993. K.S.A. 1993 Supp. 58-1202(c) essentially changed its references from prudent "man" rule to prudent "investor" rule.

K.S.A. 1993 Supp. 17-5004 in turn amended the accompanying prudent investor rule. While it elaborated upon the trustee's obligations to invest, manage, and diversify under subsection(a)(1), it also added some qualifications.

First, subsection (a)(2) expressly recognized that the trust instrument can modify the fiduciary's obligations under the prudent investor rule and, in so doing, shields the fiduciary from liability when it relies upon those trust provisions. It stated:

"If a trust, the provisions of this section [prudent investor rule] may be expanded, restricted, eliminated or otherwise altered by express provisions of the trust instrument. *The fiduciary is not liable to a beneficiary for the fiduciary's reasonable and good faith reliance on those express provisions.*" (Emphasis added.)

Second, relettered subsection (d) simply reiterated the prior law regarding per se compliance with the prudent investor rule when a trustee is following written directions by a grantor:

"In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property of a trust which is revocable or amendable, *a trustee following written directions regarding the property of the trust that are received by the trustee from the person or persons then having the power to revoke or amend the trust . . . shall be deemed to have complied with the foregoing standards provided in subsection (a)* [prudent investor]. *The trustee is authorized to follow such written directions* regardless of any fiduciary obligations to which the directing party may also be subject." (Emphasis added.)

The application of these statutory amendments to fiduciary conduct is contained in subsection (a)(5) which states: "On and after the effective date of this act [July 1, 1993], the provisions of this section shall apply to all existing and future trusts or conservatorships, but only as to actions or inactions occurring after the effective date of this act."

## 2000

The next relevant changes occurred in 2000. The act concerning general trustee powers, K.S.A. 1993 Supp. 58-1202, remained unchanged, but the Prudent Investor Act, K.S.A. 17-5004 *et seq.*, was repealed on July 1, 2000, and replaced at that time by K.S.A. 2000 Supp. 58-24a01 *et seq.*, the Uniform Prudent Investor Act.

K.S.A. 2000 Supp. 58-24a01, like its predecessor 17-5004(a)(1), concerned the prudent investor rule. It provided in relevant part: "(a) Except as otherwise provided in subsection (b), a fiduciary who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in this act."

Subsection (b) was also quite similar to its predecessor, K.S.A. 1993 Supp. 17-5004(a)(2). It expressly recognized that the trust instrument could modify the fiduciary's obligations under the prudent investor rule and, in so doing, shield the fiduciary from liability when it relied upon those trust provisions. It states: "(b) The prudent investor rule, a default rule, may be expanded, restricted, eliminated or otherwise altered by the provisions of a trust. *A fiduciary is not liable to a beneficiary to the extent that the fiduciary acted in reasonable reliance on the provisions of the trust.*" (Emphasis added.) K.S.A. 2000 Supp. 58-24a01.

The application of these statutory amendments to fiduciary conduct is contained in subsection 58-24a11 which states: "This act applies to trusts existing on and created after the effective date of this act [July 1, 2000]. As applied to trusts existing on the effective date of this act, this act governs only decisions or actions occurring after that date."

## 2001

The next relevant changes occurred in 2001. Effective July 1, 2001, K.S.A. 2001 Supp. 58-1202(c) changed the reference from the recently repealed K.S.A. 17-5004 to 58-24a02. Subsection (c) now reads: "Unless the instrument expressly states otherwise the prudent investor rule, as expressed in K.S.A. 2001 Supp. 58-24a02, and amendments thereto, shall apply as the standard for the ex-

ercise of the powers conferred upon a trustee by the uniform trustees' powers act."

Its companion, K.S.A. 2001 Supp. 58-24a02, was also now amended to establish at subsection (g) the language which had appeared earlier in K.S.A. 1993 Supp. 17-5004(d) and K.S.A. 1987 Supp. 17-5004(c) regarding per se compliance with the prudent investor rule:

> "In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property of a trust which is revocable or amendable, *a trustee following written directions regarding the property of the trust that are received by the trustee from the person or persons then having the power to revoke or amend the trust . . . shall be deemed to have complied with the foregoing standards provided in subsection (a)* [prudent investor]. *The trustee is authorized to follow such written directions* regardless of any fiduciary obligations to which the directing party may also be subject." (Emphasis added.)

### *2003*

Effective January 1, 2003, K.S.A. 58-1201 *et seq.*, the Uniform Trustees' Powers Act, was repealed and replaced by the Kansas Uniform Trust Code (KUTC), K.S.A. 2003 Supp. 58a-101 *et seq.* McGinley filed suit just 2 days later. While the KUTC therefore does not apply to the trustee Bank's acts in this case (see K.S.A. 2003 Supp. 58a-1106[a][5]), it does demonstrate the continuity of Kansas statutory law on trust issues.

For example, despite the arrival of the KUTC, the Uniform Prudent Investor Act (K.S.A. 2003 Supp. 58-24a01 *et seq.*) still governs the investment and management of trust assets. See K.S.A. 2003 Supp. 58a-901. Additionally, K.S.A. 2003 Supp. 58a-1006 remained consistent with prior law (K.S.A. 1993 Supp. 17-5004[a][2] and K.S.A. 2000 Supp. 58-24a01[b]). It states: "A Trustee who *acts in reasonable reliance on the terms of the trust* as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." (Emphasis added.)

A synthesis of these Kansas statutes leads us to conclude that during the time period relevant to the instant case the following principles apply:

1. A trustee which reasonably and in good faith relies upon express provisions of a trust instrument — including those which alter the prudent investor rule — is not liable to a beneficiary for breach of trust to the extent the breach resulted from the reliance.

2. A trustee which follows written directions regarding the property of the trust that are received from the grantor of a revocable trust:

    a. Shall be deemed to have complied with the prudent investor rule; and

    b. Is authorized to follow such written directions.

*Discussion*

McGinley's petition asserted nine, somewhat overlapping, causes of action. The district court's summary judgment decision correctly condensed them as follows: (1) breach of fiduciary duty to plaintiff; (2) negligent failure to supervise Bank employees in regard to trust assets; (3) breach of loyalty by negligently or intentionally failing to disclose its business relationship with Enron and/or its subsidiaries; (4) tortious conduct of bank employees; (5) violations of the Kansas Consumer Protection Act (KCPA); and (6) fraud and misrepresentation by silence due to the failure to disclose the conflict of interest with Enron. The court then disposed of all claims by relying upon the language of the June 21 letter and McGinley's failure to show the letter was ineffective. On appeal, McGinley frames a number of her basic arguments in ways different than the district court and even her own pleadings, which makes it difficult to match the district court's holdings with her contentions.

McGinley's First Argument: *The letter and its exculpatory provision were invalid because the Bank failed to adequately communicate and explain them to McGinley. Specifically, the letter is ineffective as a trust amendment, i.e., there is no clear and convincing evidence that McGinley intended so because it was written by the Bank on its own initiative and because of the Bank's other conduct.*

The district court held:

"Defendant's Motion for Summary Judgment is based on the contention that Plaintiff's Directive . . . [June 21, 1991 letter] defeats her claims and releases Defendant from any liability. . . .

. . . .

"Plaintiff, on the other hand, asserts that Defendant's rationale fails because the Directive is legally ineffective since it did not comply with the Trust Agreement and the then existing law. According to Plaintiff, K.S.A. 58-1202 required that the original Trust document include specific language providing that the Trust was not to follow the prudent investor rule, or the rule would, in fact, be the controlling standard. However, K.S.A. 58-24a01 provides that the prudent investor rule is a default rule that may be 'expanded, restricted, eliminated or otherwise altered by the provisions of a trust.' K.S.A. 58-24a01(b). Here, the Trust instrument essentially eliminates the prudent investor rule by providing that the Trustee must abide by Plaintiff's decisions. Plaintiff's decisions included retaining the Enron stock and releasing Defendant from any liability for losses due to retaining the stock.

"Furthermore, K.S.A. 58-24a01 precludes liability when a fiduciary acts in 'reasonable reliance on the provisions of the trust.' The Trust specifically provided that the Trustee must abide by McGinley's decisions. It follows that, because Defendant reasonably relied on Plaintiff's decision to retain the stock, Defendant cannot be held liable."

We agree with the district court's results but for slightly different reasons. See *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 623, 938 P.2d 1293 (1997) (judgment of trial court may be upheld on appeal although court may have relied upon the wrong ground). Here, the Bank was trustee of a revocable trust which McGinley established through her own legal counsel. As grantor, her intent is paramount. *Godley v. Valley View State Bank*, 277 Kan. 736, 741, 89 P.3d 595 (2004) (primary objective of trust law is to carry out the settlor's intent).

Consequently,

" '[i]f the text of the trust indenture is plain and unambiguous, the intent of the trustor (settlor) can be ascertained from the language used. [Citation omitted.] Where construction is necessary, [however,] the court must put itself in the situation of the trustor when the trustor made the trust instrument and, from consideration of the language used in the entire instrument determine the intent of the trustor. [Citations omitted.] The cardinal rule is that the intention of the trustor as gathered from the whole instrument must control unless contrary to settled principles of law.' [Citation omitted.]" 277 Kan. at 741-42.

It is clear from the specific language used in Section VIII. A of the trust that McGinley intended to carve out, from the general discretionary powers granted to the Bank as trustee, an exclusive authority for herself regarding all purchases and sales of trust as-

sets. That section states the Grantor "shall be consulted by the Trustee as to any purchase or sale, and the Trustee shall abide by the Grantor's decision."

Other trust provisions reveal McGinley also intended to retain a great deal of overall power. In Article III, she retained exclusive authority to revoke, alter, amend, modify, or change the trust instrument, in whole or in part, at any time without the consent of the trustee or any other entity or person. In Article V, she retained exclusive authority to direct the trustee to make payments for her benefit, not only from income but also principal.

We therefore hold that through the express provisions of Article VIII. A, as drafted by McGinley's own counsel, she reduced the Bank's responsibilities contained in the prudent investor rule, an alteration which is clearly authorized by the statutes previously discussed. The alteration required the Bank to abide by her decisions on buying and selling trust assets.

Pursuant to McGinley's retained authority to control buying and selling trust assets under Article VIII. A, she also signed the June 21, 1991, "Direction by Powerholder to Retain Securities" which directed the Bank to continue to retain the Enron stock. There, she expressly agreed to exonerate, indemnify and hold the Bank harmless from any and all loss, damage and expense sustained or incurred by the Bank for continuing to retain the Enron stock. Moreover, McGinley also expressly acknowledged that the Bank does not, and would not, monitor the Enron stock. She not only specifically relieved the Bank from any responsibility to *monitor* the stock, but also from any responsibility to *analyze* it. The "release and indemnification" was to remain in full force and effect until her death, disability (as determined in accordance with the trust instrument) or her written revocation. None of these events has occurred: she attended oral arguments at this court, her counsel therein admitted that disability has never been an issue, and she never has revoked the letter.

Her June 21 letter essentially told the Bank: "Do not sell my Enron stock until I say otherwise in writing, or die or become disabled. There is no need to bother me with asking my permission to sell it and therefore no need to monitor or analyze it. *I* will let

*you* know." The letter was merely one manifestation of her right, reserved under the trust, to control the Bank's sale of trust assets.

It is undisputed that at the district court level and on appeal the Bank has asserted the letter as the basis for its failure to act from 1991 forward. We therefore hold that the Bank took no action regarding the Enron stock because of the contrary "written directions" from the grantor — the person with the power to revoke or amend the trust. Consequently, under the statutes discussed earlier, the Bank complied with the prudent man/investor rule as a matter of law. Per these same statutes, the Bank was authorized to follow those directions.

McGinley argues, however, that the letter is invalid as an amendment to her trust because it does not meet the requirements, as had the 1996 formal amendment, and because there is no clear and convincing evidence that she intended the letter to be an amendment. The district court held that she had not shown the letter was legally ineffective, and we agree. The main problem with McGinley's argument is that the letter is not inconsistent with the trust instrument such that an amendment is required. Once again, the letter simply evidences the exercise of her retained right, under Article VIII. A, to control trust asset sales by directing the Bank to hold the Enron stock.

McGinley also argues that the Bank's conduct evidences that the letter was an ineffective amendment. On this issue, the district court held:

"Finally, Plaintiff contends that Defendant rendered the Directive legally ineffective by selling some Enron stock. Through this argument, Plaintiff seems to indicate that Defendant could release itself from its obligations to retain the Enron stock by simply selling some of the stock. This argument also fails since the language of the Directive clearly provides that it is to remain in effect until Plaintiff's death, disability, or written revocation. It is undisputed that none of the events required to render the document legally ineffective have occurred. Thus, Plaintiff has failed to show that Defendant's action of selling some of the stock rendered the disclaimer ineffective."

We agree. The same holds true for McGinley's argument that internal Bank documents state there was "no investment directive on file" and "no investment restrictions." Regardless of how the

Bank described the trust in its internal documents, the legal effect of the express and unambiguous terms of the trust instrument control. See *Guy Pine, Inc. v. Chrysler Motors Corp.,* 201 Kan. 371, 376, 440 P.2d 595 (1968) ("One party to a contract cannot unilaterally change the terms of the contract.").

The essence of McGinley's argument is that the Bank's actions operate as parol evidence to aid in this court's interpretation of the trust instrument and the June 21 letter. The problem with this argument is that the trust instrument, and its resultant letter, are clear and unambiguous on their faces. Accordingly, there is no need to resort to parol evidence, *i.e.,* conduct of a party which might aid in interpretation of those documents. See *Godley v. Valley View State Bank,* 277 Kan. 736, Syl. ¶ 2 (trust); *Frazier v. Railway Co.,* 97 Kan. 285, 288, 154 Pac. 1022 (1916) (letter).

McGinley's Second Argument: *The exculpatory provision is invalid because of the Bank's failure to adequately communicate its contents and effect to McGinley.*

The district court held:

> "Plaintiff also contends that the Directive is ineffective because Defendant failed to disclose the risks associated with the disclaimer. However, in her Directive, Plaintiff explicitly released Defendant from any and all liability sustained or incurred as a result of retaining the stock. Plaintiff further released Defendant from any responsibility for analyzing or monitoring the securities. The language of the Directive alone clearly indicates that Plaintiff was fully aware that there were risks associated with the disclaimer and Plaintiff was, at all times, capable of managing her own affairs."

We acknowledge that the June 21 letter contains language concerning a release of liability which could therefore suggest McGinley "was fully aware that there were risks associated with the disclaimer." We further acknowledge the Bank's argument, based upon analogizing the letter to a contract, that a person who signs such a document is bound by its terms regardless of his or her failure to understand them, in the absence of fraud, undue influence, or mutual mistake as to the contract's contents. *Rosenbaum v. Texas Energies, Inc.,* 241 Kan. 295, 299, 736 P.2d 888 (1987). Nevertheless, these acknowledgments do not fully address McGinley's allegation on appeal, *i.e.,* that the trustee Bank abused its

fiduciary relationship with its beneficiary (McGinley) because some evidence reveals that instead of fully and affirmatively communicating the contents and effect of the letter to McGinley personally, it merely obtained her signature through her husband. See *Brown v. Foulks,* 232 Kan. 424, 657 P.2d 501 (1983) ("fiduciary relation" has reference to any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party).

However, McGinley provides no relevant authority for her argument that the letter's exculpatory provision is invalid because of the Bank's abuse of the fiduciary relationship. Her references to the Restatement (Second) of Trusts, § 222 (1959) and K.S.A. 2002 Supp. 58a-1008 are inapplicable primarily because they concern invalidation due to a fiduciary's placement of exculpatory provisions in *trust instruments,* not the grantor's subsequent letters to the trustee. See English, *The Kansas Uniform Trust Code,* 51 Kan. L. Rev. 311, 344 (2003). These authorities certainly do not concern letters issued in accordance with trust provisions that had been drafted by a grantor's own legal counsel.

Similarly unpersuasive is her only other cited authority, the opinion of her expert witness, Steve Ramirez. Specifically, he opines that the letter was not an effective disclaimer of the Bank's duties because the Bank failed to disclose the risks of the exculpatory provision and failed to disclose that while the provision was intended to protect the interests of the Bank, there was little or no likelihood that it would protect the assets of the trust. He cites no legal authority for this specific opinion, however.

Moreover, an expert witness' opinions on the legal validity of the exculpatory provision are not determinative of the issue. The validity of the document and its provisions is a matter of law for this court's determination. *In re Estate of Sanders,* 261 Kan. 176, 181, 929 P.2d 153 (1996) (legal effect of a written instrument is a question of law for the court to decide; it may be construed and its legal effect determined by the appellate court regardless of the construction made by the trial court). See also *KPERS v. Kutak Rock,* 273 Kan. 481, 493, 44 P.3d 407 (2002) (The existence of a duty being

a matter of law for the court's determination, the legal conclusions of an expert witness do not settle the analysis.). Finally, while McGinley also makes a vague reference to the common law, she does not point this court to anything more specific.

Clearly the better practice for the Bank would have been to have communicated to McGinley the letter's contents and effect before she signed it, and to have notified her of evolving circumstances, *e.g.*, steady decreases in Enron's value which reduced the investment portfolio's overall worth, or steady increases, though desirable, which unbalanced the portfolio. However, McGinley fails to direct this court to any relevant authority showing the Bank had a legal obligation to do so under the facts of this case.

In short, we do agree with the district court's conclusion but on grounds other than the ones it relied upon. See *Jarboe v. Board of Sedgwick County Comm'rs,* 262 Kan. 615, 623, 938 P.2d 1293 (1997).

McGinley's Third Argument: *Even if the exculpatory provision is valid, the Bank's failure to recommend portfolio diversification lacked good faith and was indifferent to McGinley's best interest which places its conduct beyond the reach of the provision. Specifically, when the Bank failed to disclose to McGinley its evaluation of her trust being overconcentrated and failed to recommend diversification, the Bank was reckless and indifferent to McGinley's best interest. Additionally, McGinley specifically asked the Bank for its professional advice as to which stocks to sell and which stocks to keep in 2000, and the Bank failed to disclose that in its professional opinion the Enron investment should be lowered to less than 15% of the value of the trust.*

The district court did not address this issue in its memorandum decision, and the Bank argues that McGinley first raised it in her brief. The record on appeal reveals McGinley argued this issue, without objection by the Bank, at the hearing on the Bank's motion for summary judgment. Accordingly, it is sufficiently raised for our consideration on appeal. See *Jones v. Hansen,* 254 Kan. 499, 867 P.2d 303 (1994) (plaintiff raised claim only upon oral argument to

trial court on defendant's motion to dismiss, and issue is a question of law that may be decided on established facts).

As with earlier arguments, this one fails under the Kansas statutes providing that a trustee which follows written directions regarding the property of the trust that are received from the grantor of a revocable trust shall not only be deemed to have complied with the prudent investor rule but shall also be authorized to follow such instructions. Until such time as McGinley died, became disabled in the Bank's opinion, or revoked her letter in writing — none of which occurred in the instant case — the Bank was to follow her instructions to retain the Enron stock and to not monitor or analyze it. These instructions abrogated any Bank obligation to disclose to McGinley any overconcentration of Enron stock or to recommend diversification, *e.g.*, disclose its opinion about reducing the stock to less than 15% of the trust's overall value. As mentioned, it is undisputed that at the district court level and on appeal, the Bank has asserted the letter as the basis for its failure to act from 1991 forward.

In effect, McGinley argues that when circumstances evolve, the trustee should override the decisions of the grantor, *i.e.*, protect her from herself. Overriding would be inconsistent with the Kansas statutes previously discussed because the trustee is only protected when following written instructions from the grantor or when relying upon the express provisions of the trust instrument, not when directly contradicting them.

McGinley references only *Rajala v. Allied Corp.*, 919 F.2d 610, 614 (10th Cir. 1990), for her proposition, "The duty to disclose arises under Kansas law when there is a fiduciary relationship which may be created by contract or may arise from the relationship of the parties." Although the court in *Rajala* discusses Kansas fiduciary duty law, it does not mention a duty to disclose, particularly after the trustee has received a written directive from the grantor to retain the stock and to not analyze or monitor it.

As for McGinley's argument regarding the failure of the Bank to disclose in its professional opinion the Enron investments should be lowered to less than 15% of the value of the trust, she cites no authority other than her expert witness, *i.e.*, "Ramirez believes it

was a breach of the Bank's fiduciary duties." Her record references, however, do not support this assertion. While one reference expresses that the Bank has some general fiduciary duties as a professional trustee, the others primarily concern the Bank's alleged conflict of interest because of its national involvement in Enron. This issue was argued to the district court but abandoned on appeal. See *Goldbarth v. Kansas State Board of Regents,* 269 Kan. 881, 884, 9 P.3d 1251 (2000) (An issue not briefed by the appellant is deemed waived or abandoned.); see also *KPERS v. Kutak Rock,* 273 Kan. 481, 493, 44 P.3d 407 (2002) (The existence of a duty being a matter of law for the court's determination, the legal conclusions of an expert witness do not settle the analysis.).

We have thoroughly reviewed other arguments suggested by McGinley scattered throughout her brief and conclude they have no merit.

Affirmed.

LUCKERT, and GERNON, JJ., not participating.
RULON, C.J., assigned.